

**Ronald S. Connelly, Principal**
1250 Connecticut Ave NW, Eighth Floor
Washington D.C., 20036
(202) 466-6550

January 13, 2026

Ms. Susan E. Bindler
Clerk of Court
U.S. Court of Appeals for the Eighth Circuit
Thomas F. Eagleton Courthouse
111 South 10th Street
St. Louis, MO, 63102

Re: *Novartis v. Hanaway*, No. 25-1619, Notice of Supplemental Authorities

Dear Ms. Bindler:

Intervenors-Appellees submit this notice of supplemental authorities regarding federal court opinions and orders denying various drug manufacturers' motions to preliminarily enjoin several states' contract pharmacy laws, which are similar to Missouri S.B. 751. These cases relate to issues and claims raised by Novartis in this case: drug distribution versus pricing, field preemption, conflict preemption, and/or the dormant Commerce Clause. These opinions are supplemental for one of two reasons: 1) they were issued after briefing concluded in this appeal; or 2) they were issued after Intervenors-Appellees filed their brief but were not cited in Appellant's reply brief. The following cases are attached as exhibits:

1. *AbbVie, Inc. v. Fitch*, No. 24-60375, 152 F.4th 635 (5th Cir. 2025) (affirming the district court's denial of preliminary injunction on 340B preemption and Takings Clause claims);

2. *Novartis Pharms. Corp. v. Frey*, No. 1:25-cv-00407, 2025 WL 2813787 (D. Me. Sept. 23, 2025) and *AbbVie Inc. v. Frey*, No. 1:25-cv-00416, 2025 WL 2813787 (D. Me. Sept. 23, 2025) (consolidated cases) (denying preliminary injunction on 340B preemption, dormant Commerce Clause, Takings Clause, and vagueness claims);
3. *AbbVie v. Weiser*, No. 1:25-cv-01847 (D. Co. Oct. 31, 2025) (denying preliminary injunction on 340B preemption and Takings Clause claims);
4. *AstraZeneca v. Weiser*, No. 1:25-cv-02685 (D. Co. Dec. 17, 2025) (denying preliminary injunction on 340B preemption and federal patent law preemption claims).

In addition, the District of Rhode Island issued separate text orders denying Novartis's and AbbVie's motions to preliminarily enjoin that state's contract pharmacy law. Text Order, *Novartis Pharms. Corp. v. Neronha*, No. 1:25-cv-00387 (D.R.I. Sept. 30, 2025); Text Order, *AbbVie, Inc. v. Neronha*, No. 1:25-cv-00388 (D.R.I. Sept. 30, 2025).

Respectfully submitted,

*/s/ Ronald S. Connelly*
Ronald S. Connelly
*Counsel for Intervenors-Appellees*
*Missouri Hospital Association and*
*Missouri Primary Care Association*

cc: All counsel of record (via CM/ECF)

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Intervenor Defendant-Appellee's Notice of Supplemental Authority was electronically filed with the Clerk of Court via the Court's CM/ECF system, which sent notification of such filing to all counsel of record by electronic means.

Dated: January 13, 2026        Respectfully submitted,

       */s/Ronald S. Connelly*
       Ronald S. Connelly

1250 CONNECTICUT AVE NW  ■  EIGHTH FLOOR  ■  WASHINGTON DC  20036  ■  PH 202.466.6550 ■  www.PowersLaw.com

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing complies with the requirements of Fed. R. App. P. 28(j) because the body of the letter contains 271 words.

Dated: January 13, 2026

Respectfully submitted,

*/s/Ronald S. Connelly*
Ronald S. Connelly

1250 CONNECTICUT AVE NW ■ EIGHTH FLOOR ■ WASHINGTON DC 20036 ■ PH 202.466.6550 ■ www.PowersLaw.com

# Exhibit 1

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 12, 2025

Lyle W. Cayce
Clerk

No. 24-60375

AbbVie, Incorporated, *a Delaware corporation*; Allergan, Incorporated, *a Delaware corporation*; Durata Therapeutics, Incorporated, *a Delaware corporation*; AbbVie Products, L.L.C., *a Georgia limited liability company*; Aptalis Pharma US, Incorporated, *a Delaware corporation*; Pharmacyclics, L.L.C., *a Delaware limited liability company*; Allergan Sales, L.L.C., *a Delaware limited liability company*,

*Plaintiffs—Appellants*,

*versus*

Lynn Fitch, *in her official capacity as the Attorney General of the State of Mississippi*,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:24-CV-184

---

Before Elrod, *Chief Judge*, and Clement and Ramirez, *Circuit Judges*.
Per Curiam:

Under the federal Section 340B program, drug manufacturers that participate in Medicaid and Medicare Part B must offer certain drugs to healthcare providers ("covered entities") that serve uninsured and low-

income individuals at discounted prices. In recent years, drug manufacturers have enacted policies that prevent covered entities from contracting with third-party commercial pharmacies ("contract pharmacies") to distribute these discounted drugs to patients, allegedly to prevent contract pharmacies from improperly distributing the drugs to consumers for profit. But in 2024, to combat such policies, Mississippi enacted H.B. 728, which prohibits drug manufacturers from interfering with covered entities' distribution of Section 340B drugs via contract pharmacies.

Appellants, a group of drug manufacturers that participate in the 340B program (collectively, "AbbVie"), sued the Attorney General of Mississippi, alleging takings and preemption claims and seeking declaratory and injunctive relief from H.B. 728. The district court denied AbbVie's motion for a preliminary injunction.

If H.B. 728 works the way that AbbVie alleges it does—allowing covered entities and contract pharmacies to flout Section 340B's diversion ban by improperly reselling discounted Section 340B drugs—it would undoubtedly be a problematic statute. But on the specific claims and sparse record before us, we cannot say that injunctive relief is appropriate. The district court's denial of a preliminary injunction on this record was not erroneous, so we AFFIRM.

I

A

In 1992, Congress created the Section 340B program to ensure that uninsured and low-income individuals can access the medications they need and to ensure that medical providers serving these individuals receive crucial subsidies. *See* 42 U.S.C. § 256(b); *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 115 (2011). Section 340B requires drug manufacturers, as a condition of coverage of their products under Medicaid and Medicare Part B,

to agree to offer certain drugs to "covered entities" at no more than the statutorily-set "ceiling price." 42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1), (5). The list of covered entities includes, *inter alia*, federal- or state-funded hospitals and community health centers that primarily serve low-income patients. *See id.* § 256b(a)(4).

The 340B program places several key restrictions on covered entities. First, it bars "duplicate discounts or rebates," forbidding covered entities from seeking both the 340B discount and a Medicaid rebate on the same drug. *Id.* § 256b(a)(5)(A). Second, it bars "diversion," providing that a covered entity "shall not resell or otherwise transfer" a discounted drug "to a person who is not a patient of the entity." *Id.* § 256b(a)(5)(B). Third, it requires covered entities to permit the Secretary of Health & Human Services ("HHS") and drug manufacturers to "audit" their records to assess compliance with the duplicate-discount and diversion bans. *Id.* § 256b(a)(5)(C). And fourth, it provides that a covered entity that violates the duplicate-discount or diversion bans "shall be liable" to the drug manufacturer for the amount improperly received. *Id.* § 256b(a)(5)(D).

B

In 1996, four years after Section 340B's enactment, the Health Resources & Services Administration ("HRSA") noted the statute's "silen[ce] as to permissible drug distribution systems" to patients. *See* Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43549, 43549 (Aug. 23, 1996). HRSA therefore issued guidance permitting covered entities lacking an in-house dispensing pharmacy to contract with a single third-party commercial pharmacy to receive and dispense Section 340B drugs to their patients, so long as they abided by Section 340B's requirements and its duplicate-discount and diversion bans. *Id.* at 43550–55.

No. 24-60375

But in 2010, HRSA changed course, issuing new guidance permitting all covered entities—even those with an in-house dispensing pharmacy—to contract with an unlimited number of outside pharmacies to distribute Section 340B drugs to their patients. Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10272, 10273 (Mar. 5, 2010). Covered entities were quick to take advantage of this, and the number of contract pharmacies partnered with covered entities increased from 1,300 to 23,000 by 2019. *See* U.S. Gov't Accountability Off., GAO-20-212, 340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement 2 (2020). In these partnerships, "the covered entity orders and pays for the 340B drugs, which are then shipped from the manufacturer to the contract pharmacy," and the contract pharmacy then takes physical possession of but not title to the drugs. *Advisory Op. 20-06 on Contract Pharmacies under the 340B Program*, 2020 WL 11422965, at *1 (Dec. 30, 2020).[1]

By 2020, AbbVie and other drug manufacturers sought to combat the proliferation of partnerships between covered entities and contract pharmacies, which they believed "le[d] to unlawful diversion and duplicate discounts." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 458 (D.C. Cir. 2024). Drug manufacturers therefore began to adopt policies that restricted covered entities' ability to partner with contract pharmacies. AbbVie's contract-pharmacy policy, which essentially follows HRSA's 1996 guidance, permits a covered entity lacking an in-house pharmacy to distribute its

---

[1] This is how contract pharmacy partnerships are supposed to work, according to HHS. AbbVie asserts that things work differently in practice, averring that, in reality, the contract pharmacy often takes title to the drugs.

Section 340B drugs through only one contract pharmacy, located within 40 miles of the covered entity.

HHS acted quickly to prohibit drug manufacturers from imposing these restrictive contract-pharmacy policies, issuing an advisory opinion in December 2020 stating that, "to the extent contract pharmacies are acting as agents of a covered entity, a drug manufacturer in the 340B Program is obligated to deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the 340B ceiling price for those drugs." *Advisory Op. 20-06*, 2020 WL 11422965, at *1. Drug manufacturers took HHS and HRSA to court to challenge this advisory opinion, and several circuits upheld the drug manufacturers' contract-pharmacy policies as consistent with Section 340B. *See Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 704 (3d Cir. 2023); *Novartis*, 102 F.4th at 460. HHS ultimately withdrew the advisory opinion.

## C

Soon after, several states passed laws to protect covered entities' partnerships with contract pharmacies, attempting to do by statute what HHS had done in its advisory opinion.

Mississippi enacted H.B. 728, which states that drug manufacturers "shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with at 340B entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity," nor can they "interfere with a pharmacy contracted with" a covered entity. Miss. H.B. 728 § 4(1)–(2) (2024). H.B. 728 defines a "340B drug" as "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. § 256b and is purchased by a covered entity as defined in 42 U.S.C. § 256b(a)(4)."

A manufacturer that violates H.B. 728 is subject to statutory penalties for unlawful business practices under the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1 *et seq.*, including injunctions, civil penalties, criminal penalties, and restitution or revocation of licenses or certificates to "engage in business" in Mississippi. *Id.* §§ 75-24-9, -11, -19, -20.

## D

In June 2024, AbbVie, a group of drug manufacturers that participate in the 340B program, sued the Attorney General of Mississippi, challenging H.B. 728 as unconstitutional and seeking declaratory judgment and injunctive relief.

Twelve days before H.B. 728 took effect, AbbVie moved for a preliminary injunction. In its motion, AbbVie contended that: (1) H.B. 728 effectuates an unconstitutional taking of property because it compels AbbVie to transfer its drugs at significant discounts to private, for-profit pharmacies, rather than for a "public use"; and (2) H.B. 728 is preempted by federal law because it expands manufacturers' obligations under the 340B program and brings its own enforcement scheme to bear. The district court denied AbbVie's motion, concluding that AbbVie had not shown a substantial likelihood of success on the merits of its claims and therefore was not entitled to preliminary injunctive relief. AbbVie timely appealed.

## II

"The decision to grant or deny a preliminary injunction lies within the discretion of the district court and may be reversed on appeal only by a showing of abuse of discretion." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023), *cert. denied sub nom. Anibowei v. Mayorkas*, 144 S. Ct. 551 (2024). "Factual findings are reviewed for clear error, while legal conclusions are

reviewed de novo." *Jones v. Tex. Dep't of Crim. Just.*, 880 F.3d 756, 759 (5th Cir. 2018).

"[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Anibowei*, 70 F.4th at 902. To obtain a preliminary injunction, the movant must establish:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Jones*, 880 F.3d at 759 (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). The third and fourth factors "merge when the government is a party." *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023).

## III

We turn first to AbbVie's takings claim. AbbVie asserts that H.B. 728 effectuates a physical taking, or, in the alternative, a regulatory taking, for private use and without just compensation. We consider AbbVie's physical takings and regulatory takings arguments in turn.

Although it is possible that H.B. 728 could, as AbbVie asserts, allow covered entities and contract pharmacies to engage in illicit behavior that violates Section 340B, we conclude that, to the extent AbbVie has a compensable property interest in the drugs regulated by H.B. 728,[2] the

---

[2] We "understand takings analysis to be centered on the deprivation of a former owner's property interest, and not on the accretion of that interest to the government." *United States v. 0.073 Acres of Land*, 705 F.3d 540, 544 (5th Cir. 2013). Thus, for a party to have a viable takings claim, it must show that it had a "compensable property interest" in

No. 24-60375

district court did not abuse its discretion in denying preliminary injunctive relief as to AbbVie's takings claim, because AbbVie has not shown a substantial likelihood of success on the merits of this claim.

A

The government effectuates a physical taking when it "physically takes possession of an interest in property for some public purpose." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322

_____

the property allegedly taken at the time of the alleged taking. *Id.* at 544–45. State law governs "what is a property interest compensable under the Fifth Amendment." *United States v. 131.68 Acres of Land*, 695 F.2d 872, 875 (5th Cir. 1983). Here, it is unclear whether AbbVie has a compensable property interest in all drugs regulated by H.B. 728. The statute defines a "340B" drug as "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. 256b and *is purchased by a covered entity* as defined in 42 U.S.C. § 256b(a)(4)." H.B. 728 § 2(a) (emphasis added). The language "is purchased by" could plausibly refer to drugs both before and after they are purchased by a covered entity.

To the extent H.B. 728 regulates drugs pre-purchase, AbbVie has a compensable property interest in the drugs, because it still owns them. *See State v. Murphy*, 202 So.3d 1243, 1251 (Miss. 2016) (en banc) (Mississippi Constitution protects private property). But to the extent H.B. 728 regulates drugs post-purchase, AbbVie may not have a compensable property interest in the drugs, because AbbVie is no longer the drugs' owner after the point of sale. As AbbVie describes, when a covered entity partners with a contract pharmacy, orders for Section 340B drugs are placed with AbbVie using the covered entity's account. After the Section 340B drugs are purchased, AbbVie ships them to the contract pharmacy. *Advisory Op. 20-06*, 2020 WL 11422965, at *1. While AbbVie still has physical custody of the post-purchase drugs until it ships them, we have found no indication that Mississippi law recognizes a compensable property interest in goods that a party temporarily possesses on the owner's behalf. To the contrary, Mississippi law might consider AbbVie a bailee with an obligation to transfer the drugs as directed by the covered entity as bailor. *See* Miss. Code Ann. § 75-7-403 (West 2025); *Baggett v. McCormack*, 19 So. 89, 90 (Miss. 1896) (recognizing that a bailee has "no legal interest in [property], as against his bailor," but instead only a possessory interest "in the custody and care of the property" that accords with the bailor's rights as owner). Consequently, it may be the case that because AbbVie does not own the Section 340B drugs after the point of sale, it has no compensable property interest in at least some of the drugs regulated by H.B. 728. We need not decide this question, though, because we conclude that AbbVie's takings claim fails regardless.

8

(2002).  Examples of physical takings include when the government "uses its power of eminent domain to formally condemn property," "physically takes possession of property without acquiring title to it," or "occupies property"—whether on its own behalf or for the benefit of a third party. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147–48 (2021).

AbbVie has not shown that H.B. 728 effectuates a physical taking of AbbVie's property.  The record indicates that H.B. 728 does not impose on drug manufacturers a positive obligation to directly transfer or sell their drugs to anyone.  Nor does it require them to sell larger quantities of their drugs at discounted prices than Section 340B requires and thereby deprive them of sales at full market price.  Under H.B. 728, AbbVie still receives payment of the full discounted amounts to which it is entitled under Section 340B.  H.B. 728 simply imposes on drug manufacturers a negative obligation of non-interference with covered entities' arrangements with contract pharmacies, by preventing them from refusing to sell Section 340B drugs to covered entities that have arrangements with contract pharmacies and from restricting what covered entities can do with Section 340B drugs after they have purchased them.

Because AbbVie has not shown that H.B. 728 effectuates a physical taking, AbbVie cannot meet its burden of showing a substantial likelihood of success on the merits of this argument.

B

The government effectuates a regulatory taking when it "goes too far" in "impos[ing] regulations that restrict an owner's ability to use his own property." *Cedar Point Nursery*, 594 U.S. at 148 (first quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).  To determine whether a law effectuates a regulatory taking, courts apply "the flexible test" announced in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978), which

requires "balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Cedar Point Nursery*, 594 U.S. at 148. This inquiry "necessarily entails complex factual assessments of the purposes and economic effects of government actions." *Yee v. City of Escondido*, 503 U.S. 519, 523 (1992).

To the extent the regulatory takings doctrine applies,[3] AbbVie has not shown that H.B. 728 effectuates a regulatory taking under the *Penn Central* test. As to the first factor: H.B. 728 may have an economic impact on drug manufacturers, because it could increase the number of drugs for which they must provide discounts and therefore cut into their profits. AbbVie asserts that it will "face the threat of millions of dollars in forced unnecessary discounts each year." But for most drugs, manufacturers will still receive a large percentage of the market price. *See Sanofi Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, 570 F.Supp.3d 129, 208 (D.N.J. 2021) ("[T]he average discount rate appears to be between 25 and 50 percent . . . ."), *aff'd in part, rev'd in part on other grounds*, 58 F.4th 696 (3d Cir. 2023).

As to the second *Penn Central* factor: H.B. 728 does not significantly interfere with drug manufacturers' reasonable investment-backed expectations. As the district court remarked, when Congress enacted Section 340B, "only a very small number of the 11,500 covered entities used in-house pharmacies (approximately 500)," meaning that the potential for dispensation of Section 340B drugs by contract pharmacies was foreseeable. Notice Regarding Section 602, 61 Fed. Reg. at 43550. And while HRSA's

---

[3] AbbVie asserts that the regulatory takings doctrine does not apply in this case but maintains that if it does apply, H.B. 728 effectuates a regulatory taking and AbbVie still prevails. The district court applied the doctrine and concluded that H.B. 728 does not effectuate a regulatory taking.

No. 24-60375

August 1996 guidance provided a "guideline[]" of one contract pharmacy per covered entity without an in-house pharmacy, that guidance nonetheless appears to contemplate that state law might protect covered entities' "right" to purchase drugs at 340B prices and have them dispensed at multiple pharmacies. *See id.* ("*Comment:* As a matter of State [agency] law, [covered] entities possess the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients. . . . *Response:* We agree.").

As to the third *Penn Central* factor: the character of the government action in H.B. 728 weighs in the state's favor. H.B. 728 was not "enacted solely for the benefit of private parties," but rather furthers "important public interests," like expanding needy patients' access to care and giving covered entities better ability to expand and improve their services. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485–86 (1987). Record evidence shows that restrictive contract-pharmacy policies detrimentally affect patient access and provider offerings.

On balance, the *Penn Central* factors weigh heavily in the state's favor, causing us to conclude that AbbVie has not shown that H.B. 728 effectuates a regulatory taking and that AbbVie therefore has not met its burden of showing a substantial likelihood of success on the merits of this argument.

\* \* \*

In sum, because AbbVie has not met its burden of showing a substantial likelihood of success on the merits of its takings claim, whether on a physical takings or regulatory takings theory, we conclude that the

district court did not abuse its discretion in denying AbbVie preliminary injunctive relief on this claim.[4]

## IV

We turn next to AbbVie's preemption claim.  AbbVie asserts that federal law implicitly preempts H.B. 728 under both field preemption and conflict preemption theories.  The district court disagreed and denied AbbVie's request for preliminary injunctive relief.  We consider AbbVie's field preemption and conflict preemption arguments in turn.

Again, it could be the case that H.B. 728 permits illicit behavior that violates Section 340B.  But we conclude, as the district court did, that there is insufficient evidence in the record to support this allegation.  Accordingly, we hold that the district court did not abuse its discretion as to AbbVie's preemption claim, because AbbVie has not shown a substantial likelihood of success on the merits of this claim.

## A

The Supremacy Clause provides that "the Laws of the United States which shall be made in Pursuance" of the Constitution are "the supreme Law of the Land[,] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Consequently, Congress may "pre-empt a state law, rule, or other state action" through federal legislation, either "through express language in a statute" or "implicitly." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376–77 (2015).

---

[4] Because H.B. 728 effectuates neither a physical taking nor a regulatory taking, we need not consider the parties' additional arguments regarding whether any alleged taking is for a "public use" or whether the voluntary participation doctrine applies.

Congress may implicitly preempt state law in two ways: field preemption and conflict preemption.

"Deference to our federalism counsels a presumption that areas of law traditionally reserved to the states . . . are not to be disturbed absent the clear and manifest purpose of Congress." *In re Davis*, 170 F.3d 475, 481 (5th Cir. 1999) (en banc) (internal quotation marks omitted); *see Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024) (a "presumption against preemption" applies to "areas of law traditionally reserved to the states"). In keeping with this presumption, when there is doubt about preemption, the "tie goes to the state." *White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*, 420 F.3d 366, 370 (5th Cir. 2005).

B

"[T]he States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (alterations in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200 (5th Cir. 2013).

Field preemption "should not be inferred, however, simply because the agency's regulations are comprehensive." *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 149 (1986). Just because "federal provisions [a]re sufficiently comprehensive to meet the need identified by Congress d[oes] not mean that States and localities [a]re barred from identifying

additional needs or imposing further requirements in the field." *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 717 (1985).

Here, there is no federal framework so pervasive that Congress left no room for state supplementation. Section 340B is a drug pricing program that "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," *Astra*, 563 U.S. at 113; *see* 42 U.S.C. § 256(b), with the intent of supporting "services for low-income and rural communities," *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022). Section 340B explicitly regulates several key matters: it caps the prices of covered drugs, 42 U.S.C. § 256b(a)(1), (a)(10); controls eligibility for "covered entity" status, *id.* § 256b(a)(4); prohibits covered entities from claiming duplicate discounts and engaging in diversion, *id.* § 256b(a)(5)(A)-(B); enforces compliance with its caps and bars, *id.* § 256b(a)(5)(D), (d)(1)-(3); and governs distribution of discounted drugs to covered entities by manufacturers and third-party wholesalers, *id.* § 256b(a)(8).

But Section 340B does not "provide a full set of standards governing" discounted drugs for needy patients. *Arizona*, 567 U.S. at 401. Notably, it regulates neither the distribution of drugs to patients nor the role of pharmacies in this distribution. *See* Notice Regarding Section 602, 61 Fed. Reg. at 43549–50 (noting "many gaps in the legislation" and that Section 340B "is silent as to permissible drug distribution systems"); *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1144 (8th Cir.) (noting "Congressional silence on pharmacies in the context of 340B"), *cert. denied*, 145 S. Ct. 768 (2024); *Novartis*, 102 F.4th at 460 (stating that Section 340B is "silent about delivery conditions"); *Sanofi Aventis*, 58 F.4th at 703 (noting that Section 340B "is silent about delivery" of drugs to patients and "[n]owhere . . . mention[s] contract pharmacies"). As the Third Circuit has pointed out, Congress "knew how to impose delivery-related requirements" and regulate distribution, because Section 340B does authorize distribution

of drugs by manufacturers and third-party wholesalers. *Sanofi Aventis*, 58 F.4th at 704. But Congress chose not to regulate distribution to patients, indicating that it did not intend to occupy the entire field in this area. As the Supreme Court has held, "matters left unaddressed" in an otherwise "comprehensive and detailed" federal regulatory scheme "are presumably left subject to the disposition provided by state law." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994).

Next, there is no dominant federal interest in the area regulated by H.B. 728. H.B. 728 implicates two traditional general areas of state regulation and police power: public health and consumer protection. *See, e.g.*, *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 325 (2016) (noting "the State's traditional power to regulate in the area of public health"); *Castro v. Collecto, Inc.*, 634 F.3d 779, 784–85 (5th Cir. 2011) ("[S]tates have traditionally governed matters regarding contracts and consumer protections . . . ."). Although there are instances in which the Supreme Court has held that federal law preempts state law "even if the state law exercises a traditional state power," that is usually in cases in which a "principal and essential feature" of the federal law is replicated in the state law, indicating that it is a "fundamental area of [federal] regulation." *Gobeille*, 577 U.S. at 325–26.[5]

But we have recently reiterated that "[c]ourts should not infer field preemption in 'areas that have been traditionally occupied by the states,' in

---

[5] For instance, the Supreme Court and this court have recognized that there is a dominant federal interest in certain key areas of public health and consumer protection regulation. *See, e.g.*, *Gobeille*, 577 U.S. at 319–20 (noting that ERISA preempts state laws that have a "reference to" ERISA plans or an impermissible "connection with" ERISA plans); *Texas v. United States*, 945 F.3d 355, 369–71 (5th Cir. 2019) (noting the Affordable Care Act's displacement of certain state healthcare and consumer protection laws), *rev'd on other grounds sub nom. California v. Texas*, 593 U.S. 659 (2021).

which case congressional intent to preempt must be 'clear and manifest.'" *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 796 (5th Cir.) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)), *cert. denied sub nom. Nat'l Press Photographers Ass'n v. Higgins*, 145 S. Ct. 140 (2024). Here, Congress has expressed no clear and manifest intent to preempt state laws regulating the distribution of drugs to patients and the role of pharmacies in such distribution. Accordingly, applying the presumption against field preemption, we conclude that H.B. 728 is not field preempted.

C

Conflict preemption applies when "compliance with both federal and state regulations is a physical impossibility" and when the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal quotations omitted); *see Janvey*, 712 F.3d at 200. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). "'Conflict is imminent' when 'two separate remedies are brought to bear on the same activity.'" *Id.* at 380.

AbbVie raises the latter of the two conflict preemption scenarios, contending that H.B. 728 "stand[s] as an obstacle to" Congress's purposes and objectives under Section 340B, *Arizona*, 567 U.S. at 399, because it: (1) compels manufacturers to provide their drugs at Section 340B prices to entities other than those specifically enumerated in § 256b(a)(4); and (2) imposes civil and criminal penalties for noncompliance with its provisions.

AbbVie's first argument is simply incorrect. H.B. 728 does not expand Section 340B's list of covered entities to include contract

pharmacies. By its plain text, H.B. 728 requires drug manufacturers to give custody of discounted drugs to contract pharmacies only insofar as they have partnered with covered entities to distribute the drugs to patients. It does not compel manufacturers to "offer" discounted drugs to contract pharmacies in the way that Section 340B compels them to "offer" these drugs to covered entities.

AbbVie's second argument also fails because H.B. 728's enforcement scheme does not conflict with Section 340B's enforcement scheme. It is true that Congress made HHS the sole enforcer of Section 340B. *See Astra*, 563 U.S. at 120. But H.B. 728 does not intrude upon this authority because it does not impose penalties for violations of Section 340B, like failing to offer discounted drugs to covered entities or engaging in diversion. Instead, it imposes penalties when drug manufacturers violate H.B. 728 by interfering with the distribution of Section 340B drugs pursuant to covered entities' partnerships with contract pharmacies. H.B. 728's enforcement scheme therefore does not "concern[] the same subject matter" as Section 340B and cannot be said to conflict with it.

Regardless, as set out above, the presumption against preemption applies here because H.B. 728 regulates matters that have traditionally been the domain of the states. *See Deanda*, 96 F.4th at 761. Applying this presumption, we conclude that H.B. 728 is not conflict preempted.

\*          \*          \*

Again, we recognize that H.B. 728 could, if AbbVie's allegations are true, have the effect of allowing covered entities and contract pharmacies to engage in illicit activities that flout Section 340B's diversion ban. But on the record before us, we conclude that the district court did not abuse its discretion in denying preliminary injunctive relief as to AbbVie's preemption

No. 24-60375

claim because AbbVie has not proffered sufficient evidence to show a substantial likelihood of success on the merits of this claim.

V

As we understand it, AbbVie's grievance is this: it believes that when covered entities are allowed to distribute Section 340B drugs via contract pharmacies, those contract pharmacies cause covered entities to place orders for larger quantities of discounted drugs than they are actually entitled to, and the contract pharmacies then improperly resell those discounted drugs in ways that increase their profits. AbbVie avers that H.B. 728 has the practical effect of allowing this type of illicit activity to occur.

AbbVie is essentially alleging that the real problem with H.B. 728 is not a *feature* of the law, but rather a *bug*. And on this record, we cannot say that this potential bug in H.B. 728 merits a preliminary injunction. Because AbbVie has not proffered the requisite facts as to either of its claims, the district court did not abuse its discretion in denying AbbVie preliminary injunctive relief. *See Jones*, 880 F.3d at 759.

AFFIRMED.

# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

NOVARTIS                          )
PHARMACEUTICALS CORP.,            )
                                  )
          Plaintiff               )
                                  )
     v.                           )          1:25-cv-00407-JCN
                                  )
AARON FREY,                       )
                                  )
          Defendant               )

---

ABBVIE INC., et al.,              )
                                  )
          Plaintiffs              )
                                  )
     v.                           )          1:25-cv-00416-JCN
                                  )
AARON FREY, et al.,               )
                                  )
          Defendants              )

## ORDER ON MOTIONS FOR PRELIMINARY INJUNCTION

In two related cases, Plaintiffs, two pharmaceutical manufacturers and affiliated entities, challenge a Maine statute regarding the role of contract pharmacies within a federal drug discount program.  (Complaints, 1:25-cv-00407-JCN, ECF No. 1; 1:25-cv-00416-JCN, ECF No. 1.)[1]  Plaintiffs contend that the Maine statute is unconstitutional on multiple grounds: the statute is preempted by federal law, violates the commerce clause, constitutes an improper taking, and is impermissibly vague.

---

[1] Plaintiffs in case no. 1:25-cv-00416-JCN are AbbVie, Inc., Allergan, Inc., Durata Therapeutics, AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively, "Plaintiff AbbVie or AbbVie").

The matter is before the Court on Plaintiffs' motions for a preliminary injunction. (Motions, 1:25-cv-00407-JCN, ECF No. 17; 1:25-cv-00416-JCN, ECF No. 14.)  The State opposes the motions.  (Responses, 1:25-cv-00407-JCN, ECF No. 28; 1:25-cv-00416-JCN, ECF No. 27.)

After consideration of the parties' oral and written arguments, and following a review of the record, the Court denies the motions.

FACTUAL AND PROCEDURAL BACKGROUND[2]

**A.**    **The 340B Statute**

In 1992, Congress created a drug discount program referred to as the 340B program. 42 U.S.C. § 256b.  All drug manufacturers who want their drugs to be covered under Medicaid and Medicare Part B must enter into an agreement with the Secretary of Health and Human Services (HHS) to comply with 340B program requirements, including that drug manufacturers must sell covered outpatient drugs to covered entities at or below a ceiling price.  *Id.* § 256b(a)(1).  Among other provisions, the statute establishes a formula for calculating ceiling prices, *id.* § 256b(a)(2), defines covered drugs, *id.* § 256b(a)(3), (b)(2), and lists the types of healthcare facilities qualifying as covered entities, *id.* § 256(a)(4).  The discounts in the program are significant, "typically knocking 20–50% off the drug's sticker price."  *Amgen, Inc. v. Kennedy*, No. CV 24-3571 (JEB), 2025 WL 2206948, at *1 (D. D.C. Aug. 4, 2025).

---

[2] The following facts are derived primarily from public documents amenable to judicial notice and the affidavits and exhibits filed in connection with Plaintiffs' pleadings and motions.

2

Covered entities are types of facilities that generally provide care to underserved communities. *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011). "The discounts help uninsured patients, who can get cheaper drugs from covered entities. They also help covered entities themselves. The entities can buy drugs at a discount, get reimbursed by insurers for the drug's full price, and pocket the difference." *Amgen*, 2025 WL 2206948, at *1 (citations omitted).[3] Covered entities are prohibited from requesting the 340B discount for drugs that also qualify for a Medicaid rebate (referred to as a double discount), 42 U.S.C. § 256b(a)(5)(A), may not resell or otherwise transfer the discounted drugs to anyone who is not a patient of the covered entity (referred to as diversion), *id.* § 256b(a)(5)(B), and must allow the Secretary and manufacturers to audit their records according to procedures established by the Secretary, *id.* § 256b(a)(5)(C).

If the Secretary finds that a covered entity has engaged in double-discounting or diversion, the entity shall be liable to the manufacturer for the discounts it received improperly. *Id.* § 256b(a)(5)(D). In appropriate cases, the Secretary may also impose sanctions on a covered entity, which sanctions could include interest penalties,

---

[3] There may be some dispute about the extent to which insured patients benefit from the discount or whether the entire discount is retained by covered entities and others, like third-party administrators, who coordinate with covered entities. An insured patient may not benefit directly from the lower price if their out-of-pocket cost is the same, regardless of whether the drug is eligible for the discount, but there is evidently little or no dispute that some uninsured patients benefit directly and both uninsured and insured patients likely benefit indirectly because one purpose of allowing the covered entity to retain the amount of the discount is that they are able to use the extra funds in service of their patients. *See American Hospital Association v. HHS*, No. 4:20-CV-08806-YGR, 2021 WL 616323, at *1 (N.D. Cal. Feb. 17, 2021) ("covered entities . . . use the discounts to stretch scarce federal resources and serve a greater number of uninsured and under-insured patients"). The expert opinions in the record suggest the parties would dispute the extent of indirect benefits through charitable spending and other services. In any event, resolution of the dispute is not central to Plaintiffs' requests for a preliminary injunction.

disqualification of the entity for a period, and/or reference of the matter to other federal authorities. *Id.* § 256b(d)(2)(B)(v). The Secretary can also impose monetary sanctions on manufacturers for charging more than the ceiling price. *Id.* § 256b(d)(1)(B)(vi).

The 340B program "is superintended by the Health Resources and Services Administration (HRSA)," a sub-agency within HHS. *Astra USA*, 563 U.S. at 113. Several courts, however, have noted that Congress did not grant HHS broad authority to issue regulations. *See, e.g., American Hospital Association v. HHS*, No. 4:20-CV-08806-YGR, 2021 WL 616323, at *7 (N.D. Cal. Feb. 17, 2021). Rather, rulemaking authority is currently limited to "(1) establishment of [an administrative dispute resolution process (ADR)]; (2) drug-pricing methodology; and (3) imposition of monetary sanctions for violations." *Id.* (citing *Pharmaceutical Research & Manufacturers of America v. HHS*, 43 F. Supp. 3d 28, 41-45 (D. D.C. 2014).

**B.      The Role of Contract Pharmacies**

In December 1993, HRSA proposed a guidance notice regarding the 340B program which, as relevant here, specified that a covered entity may enter into a written agreement with a purchasing agent to negotiate contracts or receive drug shipments for distribution to the entity. 58 Fed. Reg. 68922, 68925. In May 1994, HRSA issued a similar final guidance notice. 59 Fed. Reg. 25110, 25113. In response to comments requesting that manufacturers not be required to sell to intermediaries, HRSA advised that covered entities often use purchasing agents or contract pharmacies, and that by placing limitations on sales transactions, manufacturers could be discouraging covered entities from participating in the program.

In November 1995, HRSA proposed a guidance notice regarding the 340B program and contract pharmacy services. 60 Fed. Reg. 55586. In August 1996, HRSA issued a substantially similar final guidance notice. 61 Fed. Reg. 43,549. 43,555–56. The notices encouraged covered entities to sign a contract pharmacy service agreement with a contractor based on model agreement terms to facilitate participation in the 340B program by covered entities that lacked access to in-house pharmacy services. The model agreement terms included a limit for one contractor site and a procedure where the covered entity would purchase the drug, the manufacturer would bill the covered entity, but the drug would be shipped directly to the contract pharmacy. Other terms in the model agreement included a commitment not to divert drugs to individuals who are not patients of a covered entity and to be subject to audits.

In 2001, HRSA established Alternate Methods Demonstration Projects, which, among other things, allowed some covered entities to apply and be approved to use a contract pharmacy to supplement an in-house pharmacy and to use multiple contract pharmacy service sites instead of a single site. 72 Fed. Reg. 1540. In January 2007, HRSA proposed new guidance that would permit all covered entities to use multiple contract pharmacy sites and to use contract pharmacies to supplement an in-house pharmacy. *Id.* at 1541. In March 2010, HRSA issued final guidelines stating that covered entities are not limited to providing in-house or contract pharmacy services at one location. 75 Fed. Red. 10272, 10277–79. In the same month, as part of the Patient Protection and Affordable Care Act, Pub. L. 111–148, 124 Stat. 119 (2010), Congress expanded the 340B program, which expansion provided that "covered entities" would also include hospitals serving isolated

5

rural areas and added some of the enforcement provisions found in the current version of the statute.

Since 2010, the 340B program has grown significantly. According to Plaintiffs, the number of participating contract pharmacy sites increased from 1,300 in 2010 to more than 33,000 in 2024. Plaintiff AbbVie (AbbVie) asserts that the number of covered entities increased from 15,000 in 2010 to more than 50,000 by 2020. Plaintiffs attribute much of the growth to the unlimited use of contract pharmacies and suggest that some of the growth is a result of improper discount claims.[4]

Covered entities and pharmacies have also shifted away from segregated inventories for 340B drugs and other drugs and toward retroactive methods of claiming and tracking 340B discounts, including a method known as the replenishment model. Plaintiffs contend that the use of multiple contract pharmacies and retroactive accounting methods makes it more difficult to detect diversion and double discounting and increases the risk that diversion, double discounting, and wrongful discount requests will occur.

---

[4] There is likely some dispute about the extent and causes of this growth. For example, Plaintiff Novartis (Novartis) asserts that total spending in the 340B program was $6.6 billion in 2010 and increased by more than a factor of 10 by 2023, reaching $66.3 billion. AbbVie asserts that by 2024, 340B spending totaled $124 billion. Plaintiffs, however, do not state whether the figures account for other relevant factors, such as changes in the average price of drugs over time, inflation overall during the period, and other changes since 2010, namely the additional categories of covered entities and thus additional patients using drugs obtained through the program. Also, by way of example, AbbVie notes that in some cases covered entities have drugs delivered to pharmacies located more than 100 miles from the covered entity's location, which it evidently believes reflects claims that were not contemplated to be within the scope of the 340B program when it was enacted. Other courts have noted, however, that "some covered entities service large geographic areas and that contract pharmacies assist those providers in serving a dispersed population." *Pharmaceutical Research & Manufacturers of America v. Murrill,* No. 6:23-CV-00997, 2024 WL 4361597, at *1 (W.D. La. Sept. 30, 2024). As with some other matters that might be in dispute, the Court need not resolve the issue at this stage of the litigation.

The replenishment model works as follows: (1) The pharmacy purchases a quantity of a drug at market price and maintains it in common inventory; (2) the pharmacy dispenses drugs from the common inventory whenever a customer arrives with a prescription without regard to whether the customer is a patient of a covered entity; (3) an administrator later reviews claims data to analyze which transactions were for covered drugs to a patient of a covered entity and thus eligible for the discount; and (4) after enough qualifying transactions have occurred, the covered entity orders more units of the drug at the discounted price to replenish the units dispensed to patients of the covered entity.

## C.   HRSA Prohibition of Manufacturer Limits

In 2020, some manufacturers, including Novartis, began to limit both the number of pharmacies to which they would deliver drugs and the maximum distance between the covered entity and the pharmacy site.  Some manufacturers also required covered entities to provide claims data to use contract pharmacies.  Novartis initially requested but did not require that covered entities provide claims data.[5]

In December 2020, the HHS Office of the General Counsel issued an advisory opinion stating that the statute unambiguously obligated manufacturers to deliver drugs to contract pharmacies because the statute only required that drugs be purchased by a covered entity and set no other requirements for eligibility.  Several manufacturers filed suit challenging the opinion. One district court struck down the advisory opinion under the Administrative Procedure Act, and the Office of the General Counsel withdrew the

---

[5] AbbVie evidently implemented similar policies later, in 2023.

7

advisory opinion in June 2021.  *See AstraZeneca Pharmaceuticals LP v. Becerra*, 543 F. Supp. 3d 47 (D. Del. 2021); *see also*, *Eli Lilly & Co. v. HHS*, No. 1:21-CV-00081-SEB-MJD, 2021 WL 5039566, at *9 (S.D. Ind. Oct. 29, 2021).

HRSA also sent letters to the manufacturers in May 2021 notifying them that by placing contract pharmacy and claims data limitations on covered entities, the manufacturers were in violation of the 340B program.  HRSA ordered the manufacturers to sell discounted drugs to covered entities without contractual conditions, including by delivering the drugs to the pharmacies with which the covered entities contracted.  The manufacturers again filed suit in several courts to challenge the alleged violations.

Most of the district courts to consider the legality of the violation letters vacated the letters, and two circuit courts ruled in favor of the manufacturers.  In *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023), the Third Circuit reasoned that because HRSA had not been granted broad rulemaking authority, because the statute did not mention contract pharmacies or delivery locations, and because the statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank," HRSA could not establish that the manufacturers violated 340B by imposing conditions on requests for delivery to contract pharmacies, which meant "the Violation Letters and Advisory Opinion are unlawful."  *Id.* at 703–04, 706.  In *Novartis Pharmaceuticals Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024), the D.C. Circuit determined that the district court properly set aside the violation letters because the statute merely requires that a manufacturer offer to sell drugs "at or below a specified monetary amount" and because the statute is "silent about delivery conditions," and "statutory silence implies that private parties may act

freely." *Id.* at 369, 373. The court noted that a manufacturer would likely violate the statute by imposing terms that are "unreasonable" or "onerous enough" to effectively increase the price above the statutory ceiling or fall short of a "bona fide offer," but the manufacturer's conditions were not so burdensome as to violate the statute on its face. *Id.* at 371–73.

## D.   State Statutes Prohibiting Manufacturer Limits

Approximately twenty states have enacted laws in response to the court decisions finding that HRSA lacked statutory authority to prohibit the manufacturers' policies. While differences exist among the state statutes, they share certain features, including prohibitions on certain manufacturer limits on covered entities and contract pharmacies, as well as alternative remedies for violations of the prohibitions. (*See* Complaint at 42–43, 1:25-cv-00416-JCN, ECF No. 1.)  Drug manufacturers filed lawsuits challenging the state statutes and seeking injunctive relief. At least five district courts, either on a motion for preliminary injunction or a motion for summary judgment, largely or entirely denied injunctive relief against the enforcement of the relevant state statute after addressing similar legal claims to those Plaintiffs assert here; on appeal, the Eighth Circuit and Fifth Circuit upheld two of those decisions.[6] At least one district court enjoined enforcement of

---

[6] *See Pharmaceutical Research & Manufacturers of America v. McClain,* 645 F. Supp. 3d 890 (E.D. Ark. 2022) (denying plaintiff's motion for summary judgment on preemption); *Pharmaceutical Research & Manufacturers of America v. McClain,* 95 F.4th 1136 (8th Cir. 2024) (affirming conclusion that Arkansas statute is not preempted), cert. denied, 145 S. Ct. 768 (2024); *Novartis Pharmaceuticals Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024) (denying plaintiff's motion for preliminary injunction); *AbbVie, Inc., v. Fitch*, No. 24-60375, 2025 WL 2630900 (5th Cir. Sept. 12, 2025) (affirming denial of preliminary injunction); *Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) (denying plaintiffs' motions for summary judgment); *Astrazenca Pharmaceuticals LP v. Bailey*, No. 2:24-CV-04143-MDH, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) (granting in part defendant's motion to dismiss plaintiff's complaint); *AbbVie Inc. v. Skrmetti*, No. 3:25-

a state statute based on similar arguments to those Plaintiffs raise here.[7]  Many other similar cases are pending in other district courts.[8]

On June 20, 2025, Maine enacted a statute entitled the "Protect Health Care for Rural and Underserved Communities Act," which statute goes into effect on September 24, 2025.  L.D. 210, Sec. P-5 (132nd Legis. 2025).  The statute creates a new "Chapter 103" within the Maine Insurance Code, and includes the following provision:

> **§7753. Prohibition of certain discriminatory actions by manufacturer or agent related to 340B entities**
>
> **1. Interference with acquisition or delivery of 340B drugs prohibited.** A manufacturer or its agent may not deny, restrict, prohibit or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B contract pharmacy on behalf of a 340B entity unless receipt of that 340B drug is prohibited by the United States Department of Health and Human Services.
>
> **2. Submission of claims or utilization data prohibited.** A manufacturer or its agent may not, either directly or indirectly, require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity

---

CV-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) (denying plaintiffs' motion for preliminary injunction).

[7] *See Pharmaceutical Research & Manufacturers of America v. Morrisey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024).

[8] *See AbbVie, Inc. v. Weiser*, 1:25-cv-01847 (D. Co.); *AbbVie v. Lopez*, 1:25-cv-00230 (D. Haw.); *AbbVie, Inc. v. Kobach*, 6:24-cv-01111 (D. Kan.); *Novartis Pharmaceuticals Corp. v. Brown*, 1:24-cv-01557 (D. Md.); *AbbVie, Inc. v. Bailey*, 4:24-cv-00996 (E.D. Mo.); *AbbVie, Inc. v. Wrigley*, 1:25-cv-00081 (D. N.D.); *AbbVie, Inc. v. Hilgers*, 4:25-cv-03089 (D. Neb.); *AbbVie, Inc. v. Jackley*, 3:25-cv-03006 (D. S.D.); *Novartis Pharmaceuticals v. Brown*, 2:25-cv-00284 (D. Utah).

unless the claims or utilization data sharing is required by the United States Department of Health and Human Services.

**3. Other interference prohibited.** A manufacturer may not otherwise interfere directly or indirectly with a 340B entity unless expressly authorized by the United States Department of Health and Human Services.

The statute defines a "340B entity" as "an entity participating or authorized to participate in the federal 340B drug discount program, as described in 42 United States Code, Section 256b, including its pharmacy, or any pharmacy contracted with the participating entity to dispense drugs purchased through the federal 340B drug discount program." 24-A M.R.S.A. § 7752(7) (effective Sept. 24, 2025). A "340B drug" is defined as "a drug that is purchased or eligible for purchase under Section 340B of the federal Public Health Service Act, 42 United States Code, Section 256b(a)(3)." 24-A M.R.S.A. § 7752(6) (eff. Sept. 24, 2025). A "340B contract pharmacy" is defined as "a pharmacy that has a contract with a 340B entity to receive and dispense 340B drugs to the 340B entity's patients on behalf of the 340B entity." 24-A M.R.S.A. § 7752(5) (effective Sept. 24, 2025).

Each violation of Chapter 103 is "subject to enforcement under the Maine Unfair Trade Practices Act." 24-A M.R.S.A. §7757(1) (effective Sept. 24, 2025). The Maine Unfair Trade Practices Act permits the Attorney General to "bring an action in the name of the State," to seek an injunction and restitution for any person who has suffered an ascertainable loss, and the Act provides that one who violates an injunction can incur a civil penalty up to $10,000 per violation. 5 M.R.S.A. § 209.

Plaintiffs filed suit in this court in August 2025 and sought a preliminary injunction enjoining enforcement of the state statute. In September 2025, amici curiae the American

Hospital Association, 340B Health, the Maine Hospital Association, and the American Society of Health-System Pharmacists, filed briefs in opposition to Plaintiffs' motions for preliminary injunctions. (Amici Briefs, 1:25-cv-00407-JCN, ECF No. 35; 1:25-cv-00416-JCN, ECF No. 34.)

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). A district court must decide whether the party seeking a preliminary injunction has carried the burden of establishing that the balance of four factors weighs in its favor:

> (1) the movant's likelihood of success on the merits, (2) whether and to what extent the movant will suffer irreparable harm in the absence of injunctive relief, (3) the balance of relative hardships, and (4) the effect, if any, that an injunction or the lack of one may have on the public interest.

*Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73, 77 (1st Cir. 2025) (quotation marks omitted). "[T]he four factors are not entitled to equal weight in the decisional calculus; rather, likelihood of success is the main bearing wall of the four-factor framework." *Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6, 9–10 (1st Cir. 2013) (quotation marks and modifications omitted).

## DISCUSSION

### A. Likelihood of Success

#### 1. Standing

The United States Constitution's limitation on the federal courts' jurisdiction to "Cases" and "Controversies" requires that a party invoking federal jurisdiction establish:

12

(1) an injury in fact that is concrete and particularized, and actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and conduct complained of; and (3) a likelihood that the injury could be redressed with a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "The plaintiff bears the burden of establishing standing" at the time of filing "and maintaining it thereafter" and must "support each element of standing with the manner and degree of evidence required at the successive stages of the litigation." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quotation marks omitted).

The State argues that Plaintiffs have not established that they have standing to pursue their claims because they are allegedly harmed only when a covered entity claims entitlement to more discount drugs than were dispensed to patients of the covered entity, which conduct is not caused by the enforcement of Maine's law. The State contends this harm would be the result of a violation of the provisions of 340B and not a consequence of Maine law.

"[A] plaintiff satisfies the injury-in-fact requirement where he [or she] alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). While pre-enforcement standing is ordinarily invoked in the face of criminal penalties, courts generally note that civil punitive statutes have a lesser but similar risk of harm and thus apply a similar inquiry for establishing standing in a pre-enforcement challenge. *See e.g., New York Bankers Association, Inc. v. City of New York*, No. 13 CIV. 7212 KPF, 2014 WL 4435427, at *12

13

(S.D.N.Y. Sept. 9, 2014); *Ostergren v. McDonnell*, No. 3:08CV362, 2008 WL 3895593, at *4 (E.D. Va. Aug. 22, 2008) ("it is not also the case that pre-enforcement challenges are limited to criminal statutes") (collecting cases).

Here, Plaintiffs have demonstrated an intent to follow their policies restricting delivery to contract pharmacies and that following the policies would likely result in state sanctions, as the State has not represented that it would not enforce the Maine statute with its attendant penalties if Plaintiffs followed their policies after the effective date of the statute. *See New York Bankers Association*, 2014 WL 4435427, at *12 (noting presumption, in pre-enforcement context, that a government will enforce punitive statutes, civil or criminal). Plaintiffs need not show more at this stage of the litigation to establish that they have standing to assert their constitutional claims. *See Defenders of Wildlife*, 504 U.S. at 561–62 ("When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.").

### 2.    Preemption Claims

Under the Supremacy Clause, the Constitution, treaties, federal statutes, and federal regulations preempt contrary state law because federal law is the "supreme Law of the Land[.]" U.S. Const. art. VI, cl. 2. "Express preemption occurs when congressional intent to preempt state law is made explicit in the language of a federal statute." *Tobin v. Federal*

14

*Express Corp.*, 775 F.3d 448, 452 (1st Cir. 2014).  There are also two types of implied preemption, "field preemption and conflict preemption."  *Capron v. Office of Attorney General of Massachusetts*, 944 F.3d 9, 21 (1st Cir. 2019).

A "presumption against preemption" ordinarily applies to implied preemption claims, *id.*, because courts have long assumed that Congress is reluctant to displace the broad police powers of the states, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  The presumption does not apply to express preemption claims, where courts instead "use the usual tools of statutory interpretation, focusing on the plain wording of the [preemption] clause, which necessarily contains the best evidence of Congress's preemptive intent." *Northwestern Selecta, Inc. v. Gonzalez-Beiro*, 145 F.4th 9, 15 (1st Cir. 2025) (quotation marks and modifications omitted).  "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks and modifications omitted).

### a.    Field Preemption

Field preemption "can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks and modifications omitted).  "Implied field preemption analysis has two parts: (1) defining the relevant regulatory field; and (2) evaluating the scope of federal regulation in that field." *Hall v. Delta Air Lines, Inc.*, No. 2:16-CV-00417-JAW, 2018 WL 1570788, at *19 (D. Me. Mar. 30, 2018).

Defining the relevant field at the proper level of generality can be challenging. Some level of specificity is required, *see Basiliali v. Allegiant Air, LLC*, No. 2:18-CV-03888-RGK-MRW, 2018 WL 6219951, at *2 (C.D. Cal. Aug. 30, 2018), but defining the field too narrowly "result[s] in an analysis that resembles conventional conflict preemption." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 705 n.22 (3d Cir. 2016).

Assessing the 340B statute at the highest level of generality, courts and parties have examined proposed fields such as the "practice of pharmacy," (Defendant's Responses at 16*; Pharmaceutical Research and Manufacturers of America v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024), the "regulation of contract pharmacies," *Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *6 (W.D. La. Sept. 30, 2024), and (somewhat more specifically) the provision of "discounted drugs for needy patients." *AbbVie, Inc., v. Fitch*, No. 24-60375, 2025 WL 2630900 at *6 (5th Cir. Sept. 12, 2025).  The Maine law would fall within with the broadly defined fields, but as the other courts have found, there can be no inference of preemptive intent because there is no dominant federal interest in such broad fields and the scope and extent of the regulations found in the 340B statute cannot reasonably be characterized as comprehensive or pervasive relative to the breadth of the fields.

Assessing the 340B statute at a lower level of generality, some courts and parties have examined proposed fields such as "340B pricing or entity eligibility to access manufacturers' drugs at 340B discounted prices." *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271, at *12 (M.D. Tenn. June 30, 2025).  Consistent with this view, Plaintiffs argue that the relevant field is defined by 340B, which focuses on the drug

16

manufacturers' principal obligation under 340B—to offer to provide discount drugs to covered entities. (*See e.g.*, AbbVie's Reply at 3, 1:25-cv-00416-JCN, ECF No. 37.)  If the field were defined in this way (i.e., the terms by which manufacturers must offer discounted drugs under the 340B program), there would be no field preemption.  As with the broader proposals of the relevant field, because 340B does not dictate many of the terms regarding manufacturers' obligation to offer and provide the drugs, the language of 340B is insufficient to imply a congressional intent to preclude all state regulation in the field.  *See Sanofi Aventis*, 58 F.4th at 704 (regarding the terms of an offer, the 340B statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank"); *Fitch*, 2025 WL 2630900 at *6 ("Congress chose not to regulate distribution to patients, indicating that it did not intend to occupy the entire field in this area. As the Supreme Court has held, matters left unaddressed in an otherwise comprehensive and detailed federal regulatory scheme are presumably left subject to the disposition provided by state law.") (quotation marks omitted).

The state law addresses covered entities' "distribution of drugs to patients and the role of pharmacies in such distribution," a subject that does not fall within a specific field that Congress manifested an intent occupy exclusively.  *Fitch*, 2025 WL 2630900 at *7.  There are evidently no cases where a court has found field preemption of a similar state statute.[9]  Courts have consistently concluded that similar state laws are not within the more

---

[9] The one case in which a court found preemption involving a similar state statute, the court appears to have based the determination on a form of conflict preemption. *Pharmaceutical Research & Manufacturers of America v. Morrisey*, 760 F. Supp. 3d 439, 452, 458 (S.D.W. Va. 2024) (concluding that "[m]ost germane

narrowly defined field.  *See e.g., Skrmetti*, 2025 WL 1805271, at \*12 ("The primary problem with the plaintiffs' position is that" the state law does not "say[ ] anything about the pricing of 340B drugs" and only "concern[s] the delivery of 340B drugs.").  While the silence in 340B as to delivery or distribution has been interpreted by some courts to permit drug manufacturers to impose "at least some delivery conditions" and not to require manufacturers to deliver to multiple contract pharmacies as a matter of federal law, *see Johnson*, 102 F.4th at 460, the silence has also been viewed by two circuit courts as reflecting that Congress did not intend to preclude state involvement.  *Fitch*, 2025 WL 2630900 at \*6; *McClain*, 95 F.4th at 1144.[10]

Given 340B's silence regarding the acts and transactions required to accomplish the objectives of the 340B program (e.g., the distribution of prescription medication at a discounted rate to covered entities), and given the sound reasoning of other courts on the field preemption issue presented here, the Court concludes that Plaintiffs have not established that they are likely to succeed on their field preemption claim.

    b.    *Conflict Preemption*

Conflict preemption occurs "where compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963), or where the state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Crosby*

---

to the No-Audits Provision is obstacle preemption" and "the Enforcement Provisions present an obstacle to this centralized purpose").

[10] The D.C. Circuit in *Johnson* did not address whether state involvement was permissible.

*v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000).  Plaintiffs do not argue that it is impossible to comply with both the federal and state obligations.  This is not a case where "federal law forbids an action that state law requires," or vice versa.  *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 486 (2013).

When analyzing whether a state statute presents an obstacle to the objectives of Congress in the enactment of a statute, a court must identify the relevant purposes, goals, or objectives of the federal law, and weigh the magnitude of the burden or the degree of the interference resulting from the state law.  *See Maine Forest Products Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022) (noting judicial concerns about "ascrib[ing] unenacted purposes and objectives to a federal statute" because "hidden legislative wishes" can be "difficult to discern" and the task "risks displacing the legislative compromises") (quotation marks omitted) (discussing *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (lead opinion of Gorsuch, J.); *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle is a matter of judgment").

The core congressional objective in this case is not difficult to discern.  The program is designed to use two other large federal spending programs to incentivize manufacturers to provide a subsidy to healthcare entities caring for underserved patients.[11]  *See Novartis*

---

[11] Plaintiffs contend that providing covered entities with discounted drugs is not the sole objective of the program. Congress placed some specific limitations on discount claims—a formula to calculate the amount of the discount, prohibitions on diversion and double discounting, and auditing requirements and penalties for violations.  Plaintiffs maintain that the limitations and enforcement provisions demonstrate an intent to limit to some degree the number of claims that would be made by covered entities and to prevent covered entities from claiming more discounts than they are entitled to receive.  Plaintiffs contend that 340B reflects Congress' intent to achieve an appropriate balance between providing discounted drugs to the covered entities and incentivizing manufacturers to participate in the program.  In support of this view, Plaintiffs cite one court's conclusion that the 340B statute has "twin federal purposes" of providing discounts and

*Pharms. Corp. v. Espinosa*, No. 21-CV-1479-DLF, 2021 WL 5161783, at *7 (D.D.C. Nov.

5, 2021) ("The purpose of Section 340B is clear—it provides discounts on drugs to certain

kinds of healthcare facilities").  As the State argues, at least as an initial matter, there is

little or no tension between the effect of the state law and the central objective of 340B.

The effect of the state statute is to prevent limits on and preserve flexibility in the methods

of distribution for covered entities, which is in harmony with the 340B goal of providing

the entities with prescription drugs at the discounted price for the benefit (directly or

indirectly) of underserved patients.

Plaintiffs argue that states have no role in implementing the 340B program and that

Maine is categorically prohibited from adopting rules that add any requirements regarding

a manufacturer's participation in the 340B program.  In other words, Plaintiffs argue that

any state rule related to the 340B program presents an "obstacle to the accomplishment and

execution of the full purposes and objectives of Congress."  *Crosby*, 530 U.S. at 373.

Courts might be less inclined to find implied preemption when the federal statute

contemplates a state implementation role within the federal program and are more likely to

find implied preemption when a federal statute does not specifically provide a role for

states.  *See Fresenius Medical Care Holdings, Inc. v. Francois*, 832 F. Supp. 2d 1364, 1368

---

protecting manufacturers or preventing fraud. *Morrisey*, 760 F. Supp. 3d at 452.  Prevention of excess claims and fraud by covered entities is a discernible goal of the 340B statute, but the "twin federal purposes" suggests that the objectives are unrelated to or of equivalent importance as each other.  In the crafting of most, if not all, federal legislation establishing a program with eligibility requirements, fraud prevention is a consideration. Ensuring that the program serves only those who are eligible is an ancillary goal of any such program. Here, protecting manufacturers against duplicate claims and otherwise preventing fraud are subsidiary goals to the objective of the 340B program, which is to subsidize the cost of drugs to underserved populations.

(N.D. Fla. 2011) (indicating that when a federal statute "has been recognized as a cooperative state-federal program . . . the case for federal preemption is less persuasive and difficult to establish").  Courts also might be more inclined to find preemption when a state law directly targets a federal program and be less inclined to infer congressional intent to preempt generally applicable state laws that impact federal programs incidentally.  *Pedraza v. Shell Oil Co.*, 942 F.2d 48, 53–54 (1st Cir. 1991) (noting that federal law preempts state laws addressing occupational safety standards but finding no basis for preemption "in the workplace of private rights and remedies traditionally afforded by state laws of general application" or "state criminal laws of general application"); *compare Planned Parenthood of Houston & Southeast Tex. v. Sanchez*, 403 F.3d 324, 341 (5th Cir. 2005) (finding preemption more likely because "[the state] is attempting to impose regulations that restrict the scope of a federal program"), *with Deanda v. Becerra*, 96 F.4th 750, 762 n.9 (5th Cir. 2024) (finding preemption less likely because the state law did not target eligibility requirements of a federal program but was instead "a generally applicable state law").

The Supreme Court, however, has never adopted a categorical rule that requires a finding of preemption whenever a state law is addressed directly to those participating in a federal program where the federal statute does not rely on the state to implement the program.  Instead, courts must determine whether the alleged obstacle presented by the state law is significant enough to compel preemption.  The case of *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644 (2003) is particularly instructive.

In 2000, the Maine state legislature created the Maine Rx Program, which was intended to authorize anyone in the state to purchase prescription drugs at the lower prices negotiated on behalf of and available to those who purchase drugs through the Medicaid program. *Id.* at 649. Maine used the prospect of imposing prior authorization requirements on nonparticipating manufacturers selling drugs through the Medicaid program to convince drug manufacturers to participate in the state program and provide similar lower prices to the public. *Id.* at 649–50. The district court granted a preliminary injunction in favor of the drug manufacturers, precluding implementation of the program. *Pharmaceutical Research & Manufacturers of America v. Commissioner, Maine DHS*, No. CIV. 00-157-B-H, 2000 WL 34290605, at *6 (D. Me. Oct. 26, 2000). The district court found obstacle preemption because although the federal Medicaid statute allowed states to impose restrictions on drug distribution as necessary to assure that care and services would be provided in a manner consistent with the best interests of Medicaid's requirements, the federal law did not specifically permit the federal Medicaid program to be used to further the interests of non-Medicaid recipients. *Id.* at *5. The district court reasoned:

> No matter how modest an obstacle the new prior authorization amounts to (the parties disagree on the severity of the obstacle), it is an obstacle—drugs on the list must be approved by the state Medicaid Medical Director before they can be dispensed or prescribed—and therefore an obstacle to the accomplishment and execution of the Congressional objectives of federal Medicaid.

*Id.* (quotation marks omitted).

"[P]erceiv[ing] no conflict between the [Maine Rx statute] and Medicaid's structure and purpose," the First Circuit reversed. *Pharmaceutical Research & Manufacturers of*

*America v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001).  The First Circuit noted that nothing in the text of the federal statute "prevents states from imposing prior authorization requirements; indeed, they are explicitly permitted," and after entertaining the argument that there were federal legislative purposes in "preventing abuse or overprescription of certain expensive medications," and in "achieving the best interests of the Medicaid recipient," the court expressed concerns about the possibility of obstruction but found an "insufficient basis" on the record of competing affidavits at that point in the proceedings to conclude that the statute presented more than a *de minimis* obstacle to achieving the goals that the plaintiff had identified.  *Id.* at 75–78.

The Supreme Court affirmed the First Circuit's decision.  *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644, 670 (2003).  Reasoning that the district court erred when it observed that it was sufficient to show any impediment to a discernable federal goal, a plurality of justices concluded that obstacle preemption required a showing of more than a "modest" impediment or harm to a federal statutory goal.  *Id.* at 665, 667 (opinion of Stevens, J.), 671 (Breyer, J., concurring); *compare Townsend v. Swank*, 404 U.S. 282, 286 (1971) (finding preempted an additional "state eligibility standard" that had the effect of excluding from welfare benefits a whole category of persons the federal program deemed eligible for assistance), *with New York State Department of Social Services v. Dublino*, 413 U.S. 405, 421–22 (1973) (not finding complimentary state law work requirements for welfare benefits preempted simply because they might become conditions for continued assistance for some individuals but remanding for further analysis of the eligibility implications of each specific work rule).

Plaintiffs contend that the impediment is sufficient to support a preemption finding because the use of the replenishment model, multiple pharmacies, and pharmacies located a considerable distance from a covered entity combine to expand the program beyond that contemplated by Congress, resulting in an unreasonable burden on manufacturers and a greater potential for fraud, which factors could limit manufacturers' involvement in the program.  At this time on this record, the Court is not persuaded that the increase in the number of 340B claims with the use of multiple pharmacies is inconsistent with the objectives of the 340B program, provided the claims are made for drugs distributed to patients of covered entities.

Under the reasoning of the Third and D.C. Circuits, congressional silence regarding the conditions that drug manufacturers can include in their offers to sell the drugs to covered entities precludes HRSA from dictating the number of pharmacies to which the manufacturers must deliver on behalf of a covered entity. *Sanofi Aventis*, 58 F.4th 696; *Johnson*, 102 F.4th 452.  The silence, however, does not necessarily reflect that Congress intended to prevent state involvement or somehow limit the number of legitimate discounted claims.  *See Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health*, 699 F.3d 962, 985 (7th Cir. 2012)  ("The question is not whether [the federal law] expressly allows a recipient state to impose its own subgrant conditions . . . [i]nstead, the pertinent question is whether [the federal law] prohibits state-imposed eligibility conditions, either expressly or by necessary implication. As we have noted, congressional and regulatory silence usually defeats a claim of preemption, not the other way around").  The Court discerns nothing in 340B to suggest that Congress intended

24

to limit the number of patients for whom covered entities may prescribe drugs at the discounted rate. For instance, there is no persuasive evidence to suggest that Congress intended to limit the number of legitimate discounted claims to a subset of a covered entity's eligible patients that corresponds to patients living in the immediate vicinity of a single in-house or designated contract pharmacy. Rather than limit eligibility and participation, in 2010, Congress significantly increased the healthcare facilities that are considered covered entities.

Plaintiffs also assert there is a direct conflict because the state law remedy overlaps with the federal remedy—namely the ADR process to be followed by a judicial proceeding—and provides an additional enforcement mechanism beyond the federal remedy. Courts have recognized that state efforts to impose additional remedies for the same violations are more likely to be preempted. *See e.g.*, *Idaho Building & Construction Trades Council, AFL-CIO v. Inland Pacific Chapter of Associated Builders & Contractors, Inc.*, 801 F.3d 950, 961 (9th Cir. 2015) (finding preemption when a state added a criminal penalty for violating a federal program enforced by federal civil and administrative remedies); *Bessette v. Avco Financial Services, Inc.*, 230 F.3d 439, 447 (1st Cir. 2000), *amended on denial of rehearing* (Dec. 15, 2000) ("[T]he broad enforcement power under the Bankruptcy Code preempts virtually all alternative mechanisms for remedying violations of the Code."). The State argues there is no overlap because potential violations of the state statute would not involve the overcharging, diversion-related, and price disputes, all of which would be subject to the ADR process under the federal statute.

25

The ADR rule provides that ADR is available to a covered entity that "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1). Plaintiffs argue that their contractual limitations on a covered entity's distribution of the drugs to patients through contract pharmacies, which is the subject of the Maine statute, could be challenged as a limitation on the ability to purchase drugs at or below the ceiling price under the federal law. The Court is not persuaded that such an interpretation presents a conflict because HRSA, the governing agency, has adopted a contrary view—a view consistent with the decisions of the Third and D.C. Circuits that 340B does not address distribution. At this stage, therefore, the alleged conflict is too speculative to support a finding that Plaintiffs are likely to prevail on the claim.

Plaintiffs further argue that the state law's requirement that manufacturers cannot condition participation in the program on the covered entities providing claims data impermissibly conflicts with 340B. A discernible secondary goal of 340B is to prevent excess claims and fraud, and the ADR process is evidently intended to assist in that objective. Plaintiffs submit that they need claims data to prevent fraud and meet the "reasonable cause" level of suspicion necessary to initiate an audit. Plaintiffs' concern regarding access to evidence of possible violations is not unreasonable. Plaintiffs, however, have not demonstrated that claims data are necessary to obtain an audit or that the proof necessary to obtain an audit is particularly onerous. For instance, Plaintiffs have not shown that the trends upon which they rely to support their injury-in-fact standing argument would be insufficient to obtain an audit. The 340B program and the audit process

have existed for many years, but Plaintiffs have not identified cases where a manufacturer had requested but been denied an audit due to a lack of relevant claims data. On the current record, the alleged impediment is too speculative to support a finding that Plaintiffs are likely to prevail on their claim.

Finally, the "subtle refram[ing]" of the obstacle preemption inquiry, which the First Circuit has identified in more recent Supreme Court opinions, does not assist Plaintiffs. *Maine Forest Products Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022). According to the First Circuit, the Supreme Court has asked whether the federal statute "implicitly confer[s] a right" to engage in certain conduct subject only to certain federal standards and be free from the state law regulation. *Id.* (discussing *Kansas v. Garcia*, 589 U.S. 191, 210 (2020) and *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 479 (2018)). As discussed above, the limited specified requirements of the 340B program and Congress's silence on all other aspects of the transactions necessary to accomplish the objectives of 340B do not imply that Congress intended to confer on manufacturers a right to be free from all state law requirements regarding drug distribution to patients, contract pharmacies, and claims data.

In sum, at this stage of the proceedings on the current record, which includes competing affidavits, the Court is not convinced that it is more likely than not that Plaintiffs will establish that Maine's statute represents more than a modest impediment to drug manufacturers' participation in and the goals of 340B. As related to obstacle conflict preemption, the Court is not persuaded that there is a significant risk that the state law is likely to cause manufacturers to withdraw from or not participate in the 340B program such

that the core objectives of the program would be compromised.  Plaintiffs, therefore, have failed to establish a likelihood of success on their obstacle preemption claim.

### 3.      Dormant Commerce Claim

"The Commerce Clause provides that Congress shall have power to regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes." *Association To Preserve & Protect Local Livelihoods v. Sidman*, 147 F.4th 40, 55 (1st Cir. 2025) (quotation marks and modifications omitted) (quoting U.S. Const. art. I, § 8, cl. 3). Although the text is framed as a grant of power to Congress, the Supreme Court has long "held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state [regulation] even when Congress has failed to legislate on the subject." *Oklahoma Tax Commission v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

The doctrine primarily "bars states and localities from pursuing economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73, 78 (1st Cir. 2025) (quotation marks omitted).  "To ascertain whether a regulatory measure is so designed, we look for evidence of either discriminatory purpose or discriminatory effect, recognizing the primacy of the latter in the dormant Commerce Clause analysis of facially neutral legislation." *Id.* (quotation marks and modifications omitted).

Plaintiffs argue that the state statute discriminates against out-of-state manufacturers for the benefit of in-state providers and pharmacies.  Even assuming the

28

burdens and benefits are as Plaintiffs assert, Plaintiffs are not likely to prevail on their claim. The question "is not whether a statute discriminates at all, but whether it discriminates between substantially similar entities in a single market. Indeed, the principle that any notion of discrimination assumes a comparison of substantially similar entities is a fundamental element of dormant Commerce Clause jurisprudence." *American Trucking Associations, Inc. v. Rhode Island Turnpike & Bridge Authority*, 123 F.4th 27, 37 (1st Cir. 2024) (quotation marks and citations omitted). Although Plaintiffs contend that contract pharmacies and manufacturers compete for customers "vertically" in a single market, they do not explain why they are substantially similar. In practice, the manufacturers create the drugs and sell them to covered entities for patients, the covered entities buy drugs from the manufacturers and distribute them to patients at an equivalent or reduced cost, and pharmacies act as the conduit for distribution. The roles are meaningfully different and cannot be viewed as similar entities.

Plaintiffs cite *Healy v. Beer Institute*, 491 U.S. 324, 336 (1989), for the proposition that states may not regulate transactions occurring wholly outside their borders. The Supreme Court, however, has arguably limited the concerns about extraterritorial price impacts identified in *Beer Institute*. *See National Pork Producers Council v. Ross*, 598 U.S. 356, 143 (2023) (rejecting "'almost per se' rule against laws that have the 'practical effect' of 'controlling' extraterritorial commerce").

In addition, in *Walsh*, the First Circuit and the Supreme Court rejected the argument that requiring certain discounts for in-state drug transactions had extraterritorial impacts

29

based on the series of upstream transactions involving out of state middlepersons before a drug is finally distributed to the consumer.

> [A]s the Court of Appeals correctly stated, unlike price control or price affirmation statutes, "the Maine Act does not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect. Maine does not insist that manufacturers sell their drugs to a wholesaler for a certain price. Similarly, Maine is not tying the price of its in-state products to out-of-state prices." 249 F.3d, at 81–82 (footnote omitted). The rule that was applied in *Baldwin* and *Healy* accordingly is not applicable to this case.

*Walsh*, 538 U.S. at 669.  The Court is not convinced that a different analysis applies in this case.

Plaintiffs also invoke the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) to support the commerce clause claim.  Under *Pike*, a court is asked "to determine whether a facially non-discriminatory local measure violates the Dormant Commerce Clause" by inquiring "whether the burdens (if any) that the measure imposes on interstate commerce are clearly excessive in relation to the claimed local benefits that it secures." *Sidman*, 147 F.4th at 64.  Plaintiffs, however, have not demonstrated that they are likely to establish that the Maine statute imposes an excessive burden on interstate commerce.  As Plaintiffs correctly note, despite the language of the Maine statute, there are no 340B drugs.  Rather, the drugs that are covered by the 340B program are the same drugs that Plaintiffs manufacture and sell for patients of all healthcare providers.  The 340B program simply contemplates that a portion of the drugs that Plaintiffs manufacture and sell would be sold at a discounted rate to covered entities.  The Maine statute, therefore, is unlikely to affect significantly the quantity of drugs that will be sold in interstate commerce.   Plaintiffs' principal concern is that under the Maine statute, their

administrative costs will increase, and they will be required to sell more drugs at a discounted rate.  In other words, Plaintiffs would be harmed in the form of a reduction in their profits.   A reduction in Plaintiffs' profitability, if proven, would not constitute an excessive burden on interstate commerce. *See Construction Materials Recycling Association Issues & Education Fund, Inc. v. Burack*, 686 F. Supp. 2d 162, 172 (D.N.H. 2010) ("A dormant Commerce Clause claim, however, cannot be based merely on a showing that a challenged statute will cause individual out-of-state businesses to lose profits").  In short, Plaintiffs have not established that they are likely to succeed on their dormant commerce claims.

### 4.      Takings Claim

AbbVie contends that "Maine's law effects a physical taking of AbbVie's property by forcing AbbVie to transfer its pharmaceutical products to private third parties for discounted prices." (AbbVie Motion at 18.)

The Fifth Amendment prohibits "private property" from being "taken for public use, without just compensation."  U.S. Const. amend. V.  The Fifth Amendment applies to the federal government, but "[t]hat prohibition . . . applies against the States through the Fourteenth Amendment." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980).  "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002) (citation omitted).

31

"When an entity voluntarily participates in a federal program, it forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation." *Astrazenca Pharmaceuticals LP v. Bailey*, No. 2:24-CV-04143-MDH, 2025 WL 644285, at *4 (W.D. Mo. Feb. 27, 2025). A government does not take property by creating a "financial inducement" to comply voluntarily. *See Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *14 (W.D. La. Sept. 30, 2024); *see also*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984) ("as long as Monsanto is aware of the conditions under which the data are submitted, and the conditions are rationally related to a legitimate Government interest, a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking").

The voluntary nature of the 340B program, therefore, would appear to present an impediment to AbbVie's takings claim. AbbVie asserts that the voluntariness of the federal program does not impact the analysis at least in part because there was no independent state law benefit offered with the state requirements. AbbVie relies on cases finding that alleged benefit was illusory and thus the program was not truly voluntary, *see Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023) (discussing *Horne v. Department of Agriculture*, 576 U.S. 350 (2015)), but AbbVie does not provide any persuasive authority to support the contention that each new regulatory condition must be accompanied by a separate benefit to maintain the voluntary nature of the program for

32

purposes of a takings claim.  Because AbbVie can choose not to participate in the 340B program, AbbVie has not demonstrated a likelihood of success on its takings claim.[12]

### 5.     Vagueness Claim

AbbVie maintains that Maine's statute is impermissibly vague because there is little or no guidance for what it means to "interfere" with covered entities and the delivery of covered drugs to contract pharmacies on behalf of covered entities.  Under the Due Process Clauses of the Fifth and Fourteenth Amendments, "[a] statute is impermissibly vague if (1) 'it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'it authorizes or even encourages arbitrary and discriminatory enforcement.'" *March v. Frey*, 458 F. Supp. 3d 16, 39 (D. Me. 2020) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  However, legislatures need not attempt to achieve "semantic certainty," *Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2016), because "words are rough-hewn tools, not surgically precise instruments."  *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011).

---

[12] AbbVie primarily argues the state law effects a physical taking rather than a regulatory taking.  The Supreme Court has also recognized that even without taking physical possession, "if regulation goes too far it will be recognized as a taking."  *Id.* at 326 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). A regulatory taking occurs "where government requires an owner to suffer a permanent physical invasion of her property," or "completely deprive[s] an owner of all economically beneficial use of her property," or demands an exaction as a condition to approving development, such as a public easement, that is disproportionate to the impact of the proposed development.  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538–39, 546–48 (2005) (quotation omitted).  When presented with a regulatory takings claim that does not implicate one of the situations identified in *Lingle*, courts employ a "more nuanced, three-pronged inquiry into (1) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; (2) the regulation's economic impact on the property owner; and (3) the character of the government action."  *Maine Education Association Benefits Trust v. Cioppa*, 695 F.3d 145, 153 (1st Cir. 2012) (citing *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124 (1978)).  To the extent that AbbVie asserted during oral argument that under a regulatory takings analysis, Maine's law constitutes a taking, the voluntariness issue likely still bars the claim, and even if it did not, the Court is not persuaded that AbbVie is likely to satisfy the stringent requirements of a regulatory takings claim.

While courts have acknowledged that terms like "interfere with" can be indefinite enough to create vagueness concerns if read in a vacuum, *see Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 786 (4th Cir. 2023), "[h]ere . . . the challenged [terms] do not appear in a vacuum" because the statute "contains additional terms that supply concrete guidance," at least to some degree, "as to the behavior that it prohibits and the circumstances in which it can be enforced." *URI Student Senate*, 631 F.3d at 14. The statute's language that manufacturers "may not deny, restrict, [or] prohibit" the "acquisition" or "delivery" of certain drugs, and the title of the provision addressing "discriminatory actions by manufacturer or agent related to 340B entities" narrow the scope of the term "interfere" considerably. Nearby provisions in Chapter 103 also use the word "interfere" in the context of discriminatory policies that impose conditions on 340B participants that are not imposed on comparable nonparticipants. *See* 24-A M.R.S.A. §7754(4)–(5) (effective Sept. 24, 2025). The statute itself, therefore, provides reasonable guidance and notice to AbbVie and those similarly situated.

Several other important factors undermine the void-for-vagueness claim here. First, perhaps because imprecise terms can "take on definiteness and clarity" when "directed to a discrete professional group," *In re Bithoney*, 486 F.2d 319, 324 (1st Cir. 1973), "the doctrine is applied more leniently in the sphere of economic regulation of sophisticated parties." *FERC v. Silkman*, 177 F. Supp. 3d 683, 702 (D. Mass. 2016) (citing *U.S. v. Lachman*, 387 F.3d 42, 56–57 (1st Cir. 2004)). AbbVie certainly qualifies. Second, the harm resulting from a lack of specificity is lessened "by the scienter requirement" that must be satisfied before drug manufacturers would face civil penalties. *Id.*; *March*, 458 F. Supp.

34

3d at 39.[13]  Third, statutory imprecision is less likely to offend due process when there is a method "to allow private parties to obtain an official government answer on whether [the conduct] is covered" before facing penalties, *United States v. Zhen Zhou Wu*, 711 F.3d 1, 15 (1st Cir. 2013), and the enforcement mechanism contains that opportunity before it creates a risk of financial penalties.  Fourth, federal courts are less likely to find a state statute to be unconstitutionally vague in a pre-enforcement context where a plaintiff brings the case before the state court had the opportunity to interpret the state law. *See Donovan v. City of Haverhill*, 311 F.3d 74, 78 (1st Cir. 2002) (courts should "presume that state courts will give [challenged provision] a limiting construction that will preserve its facial constitutionality"); *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (treading carefully when the state courts "have had no occasion to construe the law in the context of actual disputes . . . or to accord the law a limiting construction").  Fifth, "the [Supreme] Court has expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (quotation marks omitted).

Finally, except in the First Amendment context, a plaintiff is not generally permitted to pursue facial pre-enforcement vagueness challenges and courts instead "consider

---

[13] It appears that state enforcement of the Maine statute effectively requires a willful violation before the imposition of monetary penalties.  As the Court reads the statute, to enforce the statute, the state attorney general would initiate a state court proceeding after first providing notice and conferring with the manufacturer, which lawsuit might then lead to an injunction from the state court against the offending practice, and the manufacturer would only face monetary penalties if it continued the offending conduct in violation of the injunction.

whether a statute is vague as applied to the particular facts at issue, for a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) (quotation marks omitted).  AbbVie asserts an as applied argument. Notably, AbbVie has not argued that it is uncertain whether the state statute prohibits the policies it has implemented in recent years.  All parties acknowledge that the Maine statute and similar statutes enacted in other states are designed to prevent manufacturers from maintaining the restrictive policies employed by AbbVie.

In sum, the word "interfere" is not so indefinite in the context of the state statute and the 340B program that it presents constitutional concerns at this stage.  All the relevant factors suggest that AbbVie is not likely to succeed on its void-for-vagueness claim.

## B.    Other Factors

Because Plaintiffs have failed to establish that they will likely succeed on the merits of their preemption, commerce clause, takings, or vagueness claims, the Court need not dwell on the remaining preliminary injunction factors.  Where Plaintiffs have failed to demonstrate a likelihood of success on their claims, irreparable harm, the balance of hardships, and the public interest are inconsequential.  *See New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity").

36

## CONCLUSION

After an assessment of the factors relevant to Plaintiffs' requests for a preliminary injunction, the Court concludes that Plaintiffs are not entitled to preliminary injunctive relief.  Accordingly, the Court denies Plaintiffs' motions for a preliminary injunction.


/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 23rd day of September, 2025.

# **Exhibit 3**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 25-cv-1847-WJM-KAS

ABBVIE, INC., *et al.*,

     Plaintiffs,

v.

PHILIP WEISER, *et al.*,

     Defendants.

---

**ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

---

Plaintiffs AbbVie, Inc., Allergan, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively, "Plaintiffs" or "AbbVie") bring this lawsuit against Defendants Philip Weiser, in his official capacity as Attorney General of the State of Colorado; and Kristen Wolf, Ryan Leyland, Patricia Evacko, Avani Soni, Michael Scruggs, Alexandra Zuccarelli, and Jayant Patel, in their official capacities as members of the Colorado State Board of Pharmacy (collectively, "Defendants"), to challenge the constitutionality of Colorado Senate Bill 25-071, now codified as the Colorado 340B Contract Pharmacy Protection Act, Colorado Revised Statutes (C.R.S.) §§ 6-29-101 *et seq.* (2025) (the "Act").[1]  (ECF No. 43.)

Currently before the Court is AbbVie's Motion for a Preliminary Injunction ("Motion"), by which it seeks to preliminarily enjoin enforcement of the Act.  (ECF No. 7; *see also* ECF No. 43 at 65 ¶ 4.)  The Motion has been fully briefed (ECF Nos. 33, 36,

---

[1] The Act went into effect on August 6, 2025.  (*See* ECF No. 33-1 at 9.)

1

52, 74),[2] and the Court presided over an evidentiary hearing on the Motion on

September 19, 2025 (ECF No. 93).  Thus, it is now ripe for adjudication.

For the reasons set forth below, the Motion is denied.

## I.    BACKGROUND[3]

### A.    Section 340B

In 1992, Congress enacted § 340B of the Public Health Service Act, 42 U.S.C.

§ 256b ("Section 340B")—thereby creating the "340B Program"—"to ensure that

uninsured and low-income individuals can access the medications they need and to

ensure that medical providers serving those individuals receive crucial subsidies."

*AbbVie, Inc. v. Fitch,* 152 F.4th 635, 639 (5th Cir. 2025).  The 340B Program

accomplishes this by "impos[ing] ceilings on prices drug manufacturers may charge for

medications sold to specified health-care facilities."  *Astra USA, Inc. v. Santa Clara*

*County, Cal.,* 563 U.S. 110, 113 (2011).  Those facilities, called "covered entities,"

"include public hospitals and community health centers, many of them providers of

safety-net services to the poor."  *Id.; see also* § 256b(a)(4) (defining "covered entity").

---

[2] With the Court's leave, *Amici Curiae* American Hospital Association, 340B Health, Colorado Hospital Association, and American Society of Health-System Pharmacists (collectively, the "*Amici*") also filed a brief in opposition to the Motion.  (ECF No. 34-1.)

[3] Numerous federal courts have now had occasion to summarize the history of the 340B Program and related HHS guidance relevant to this lawsuit, including the Supreme Court and four Circuit Courts of Appeal.  *See Astra USA, Inc. v. Santa Clara County, Cal.,* 563 U.S. 110 (2011); *AbbVie, Inc. v. Fitch,* 152 F.4th 635 (5th Cir. 2025); *PhRMA v. McClain,* 95 F.4th 1136 (8th Cir. 2024); *Novartis Pharms. Corp. v. Johnson,* 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.,* 58 F.4th 696 (3d Cir. 2023).  The Court leverages the factual background set forth in those decisions where applicable and adds further detail from the parties' briefing on the Motion where needed.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

The 340B Program helps covered entities care for their low-income and rural patients in two ways: "First, it gives them extra revenue from serving insured patients: they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount. Second, it enables them to give uninsured patients drugs at little or no cost." *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.,* 58 F.4th 696, 699 (3d Cir. 2023).

The 340B Program "is superintended by the Health Resources and Services Administration ('HRSA'), a unit of the Department of Health and Human Services ('HHS')." *Astra,* 563 U.S. at 113. "Drug manufacturers opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement ('PPA') used nationwide." *Id.* "PPAs are not transactional, bargained-for contracts." *Id.* Rather, "[t]hey are uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary of HHS." *Id.* Specifically, the PPA obligates manufacturers to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." § 256b(a)(1). Manufacturers' eligibility to participate in Medicaid and Medicare Part B "is conditioned on their entry into PPAs for covered drugs purchased by [covered] entities." *Astra,* 563 U.S. at 113.

Section 340B also prohibits covered entities from engaging in certain conduct:

> First, it bars 'duplicate discounts or rebates,' forbidding covered entities from seeking both the 340B discount and a Medicaid rebate on the same drug. [42 U.S.C.] § 256b(a)(5)(A). Second, it bars 'diversion,' providing that a covered entity 'shall not resell or otherwise transfer' a discounted drug 'to a person who is not a patient of the entity.' *Id.* § 256b(a)(5)(B). Third, it requires covered

> entities to permit [HHS] and drug manufacturers to 'audit'
> their records to assess compliance with the duplicate-
> discount and diversion bans. *Id.* § 256b(a)(5)(C). And
> fourth, it provides that a covered entity that violates the
> duplicate-discount or diversion bans 'shall be liable' to the
> drug manufacturer for the amount improperly received. *Id.*
> § 256b(a)(5)(D).

*Fitch,* 152 F.4th at 640.

## B.    Role of Contract Pharmacies

"When Congress first enacted Section 340B, few covered entities had pharmacies in house," *Sanofi Aventis,* 58 F.4th at 700, in substantial part because, for many, "building or maintaining [an in-house] pharmacy is cost-prohibitive," *PhRMA v. McClain,* 95 F.4th 1136, 1139 (8th Cir. 2024). Thus, "[s]ince the beginning, covered entities have contracted with outside pharmacies," or "contract pharmacies," "for the distribution and dispensation of 340B drugs." *Id.* For covered entities with large, rural service areas, "the outsourcing of pharmacy services [also] allowed for drug dispensation closer to where [their] low-income patients reside." *McClain,* 95 F.4th at 1139. "Covered entities using contract pharmacies would still order and pay for the drugs, but they would be shipped directly to the pharmacies." *Sanofi Aventis,* 58 F.4th at 700.

Noting covered entities' reliance on contract pharmacies and Section 340B's "silen[ce] as to permissible drug distribution systems" to patients, 61 Fed. Reg. 43, 549, 43,549 (Aug. 23, 1996), HRSA issued guidance in 1996 "permitting covered entities lacking an in-house dispensing pharmacy to contract with a single third-party commercial pharmacy to receive and dispense 340B drugs to their patients, so long as they abided by Section 340B's requirements and its duplicate-discount and diversion

bans," *Fitch,* 152 F.4th at 640 (citing *id.* at 43,550–55).  Then, in 2010, HRSA "changed course" and "issu[ed] new guidance permitting all covered entities—even those with an in-house dispensing pharmacy—to contract with an unlimited number of outside pharmacies to distribute Section 340B drugs to their patients."  *Fitch,* 152 F.4th at 640; 75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010).

After the 2010 guidance, the use of contract pharmacies proliferated, and pharmaceutical manufacturers became increasingly concerned that "contract pharmacies were driving up duplicate discounting and diversion."  *Sanofi Aventis,* 58 F.4th at 700; *see also Novartis Pharms. Corp. v. Johnson,* 102 F.4th 452, 457 (D.C. Cir. 2024) (citing governmental report indicating that "the number of contract pharmacies participating in the program increased from about 1,300 to 23,000" between 2010 and 2019).  So, manufacturers began adopting policies "that limited or prohibited covered entities from contracting with outside pharmacies for the dispensation of 340B drugs to patients."  *McClain,* 95 F.4th at 1139.

AbbVie adopted one such policy, its "340B Program Integrity Initiative," in 2023. (ECF No. 7-1 at 3 ¶ 4.)  Under the current iteration of AbbVie's policy, last updated in February 2025, "hospital covered entities" "*without* an in-house outpatient pharmacy may designate a single contract location" "within 40 miles of the HRSA registered covered entity parent site" to receive "orders of 340B priced medicines," provided that the covered entity also "submits limited claims data on 340B utilization" for that contract pharmacy location.  (*Id.* at 51–52 (emphasis in original).)  *See also Fitch,* 152 F.4th at 641 (noting "AbbVie's contract-pharmacy policy . . . essentially follows HRSA's 1996 guidance").

"HHS acted quickly to prohibit drug manufacturers from imposing these restrictive contract-pharmacy policies." *Id.* In December 2020, HHS issued an advisory opinion concluding that, "to the extent contract pharmacies are acting as agents of a covered entity, a drug manufacturer in the 340B Program is obligated to deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the ceiling price for those drugs." OIG Advisory Op. No. 20-06, 2020 WL 11422965, at *1 (Dec. 30, 2020).

Manufacturers sued. Ultimately, the Third and D.C. Circuits upheld the manufacturers' policies because "Congress never said that drug makers must deliver discounted 340B drugs to an unlimited number of contract pharmacies." *Sanofi Aventis,* 58 F.4th at 707; *Novartis Pharms.*, 102 F.4th at 455 (agreeing that "section 340B does not prohibit manufacturers from limiting the distribution of discounted drugs by contract").[4] HHS withdrew the advisory opinion. *Fitch,* 152 F.4th at 641.

## C.    State Legislatures Weigh In

Following the Third and D.C. Circuits decisions, "several states passed laws to protect covered entities' partnerships with contract pharmacies, attempting to do by statute what HHS had done in its advisory opinion." *Id.*

As pertinent here, the Act was signed into Colorado law on May 30, 2025. (ECF No. 33-1 at 10.) Its operative provision prohibits manufacturers from undertaking the following acts:

> (a)    Unless the receipt of the 340B drugs is prohibited by
> the federal department of health and human services, a

---

[4] A third appeal is currently pending before the Seventh Circuit. *See Eli Lilly & Co. v. HHS, et al.*, No. 21-3405 (7th Cir.).

6

manufacturer, third-party logistics provider, or repackager, or an agent, contractor, or affiliate of a manufacturer, third-party logistics provider, or repackager, including an entity that collects or processes health information, shall not, directly or indirectly, deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or a location otherwise authorized by a 340B covered entity to receive and dispense 340B drugs.

(b)    A manufacturer shall not directly or indirectly require, including as a condition, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or any other location authorized to receive 340B drugs by a 340B covered entity to submit any health information, claims or utilization data, purchasing data, payment data, or other data that does not relate to a claim submitted to a federal health care program, unless such data is voluntarily furnished by such covered entity or otherwise required to be furnished under applicable federal law.

§ 6-29-105(1).  A violation of the Act is an unfair or deceptive trade practice under the Colorado Consumer Protection Act ("CCPA"), and the violator is subject to CCPA enforcement provisions and penalties, including monetary fines of up to $20,000 per violation.  § 6-29-105(3)(a).

Pharmaceutical manufacturers have filed many lawsuits challenging state laws comparable to the Act.  Unlike their earlier challenges to the 2020 HHS guidance, the very large majority of these lawsuits have been unsuccessful to date.[5]

---

[5] *See AbbVie Inc. v. Neronha,* 1:25-cv-00388-JJM-AEM (D.R.I. Sept. 30, 2025) (denying preliminary injunction as to Rhode Island law); *AbbVie, Inc. v. Frey,* 2025 WL 2813787, at *1 (D. Me. Sept. 23, 2024) (same as to Maine law); *AstraZeneca Pharms. LP v. Fitch,* 766 F. Supp. 3d 657, 664–65 (W.D. Miss. 2024) (same as to Mississippi law); *Novartis Pharms. Corp. v. Fitch,* 738 F. Supp. 3d 737, 749–50 (S.D. Miss. 2024) (same); *AbbVie Inc. v. Skrmetti,* 2025 WL 1805271, at *18 (M.D. Tenn. June 30, 2025) (same as to Tennessee law); *AstraZeneca Pharms. LP v. Bailey,* 2025 WL 644285, at *3 (W.D. Mo. Feb. 27, 2025) (granting motion to dismiss manufacturer's claims that Missouri law was preempted and violated the Takings Clause); *PhRMA v. Murrill,* 2024 WL 4361597, at *8–9 (W.D. La. Sept. 30, 2024) (granting

**D.    Procedural History**

AbbVie filed this lawsuit challenging the constitutionality of the Act on June 12, 2025 (ECF No. 1) and moved for a preliminary injunction one day later (ECF No. 7). After setting oral argument on the Motion, AbbVie requested an evidentiary hearing so that it could proffer the testimony of three witnesses in support of its requested relief. (ECF No. 31.)  The Court set an evidentiary hearing at AbbVie's behest.  (ECF No. 32.)

During the September 19, 2025 hearing, the Court heard the testimony of five witnesses in total.  First, AbbVie called expert witness Alice Chen, Ph.D., a professor of public policy at the University of Southern California, to generally "testify about . . . how the [340B] program operates in practice" and "explain the growth of contract pharmacies."  (ECF No. 111 at 19:11–20; *see also* ECF No. 36-2.)  Second, AbbVie called Mr. Edward Scheidler, its corporate representative, to "explain that, in fact, AbbVie will not sell its drugs at the 340B price unless [its] conditions are agreed to, which [AbbVie avers] is a complete answer to the State's position on takings."  (ECF No. 111 at 20:1–6.)  And lastly, AbbVie called expert witness Dr. Amitabh Chandra, a professor of public policy at Harvard University, to "explain where the research shows

---

summary judgment in favor of State on manufacturers' claims that Louisiana law was preempted and violated the Takings Clause); *AbbVie Inc. v. Fitch,* 2024 WL 3503965, at *12 (S.D. Miss. July 22, 2024) (denying preliminary injunction as to Mississippi law), *aff'd* 152 F.4th 635 (5th Cir. 2025); *PhRMA v. Fitch,* 2024 WL 3277365, at *11 (S.D. Miss. July 1, 2024) (same); *PhRMA v. McClain,* 645 F. Supp. 3d 890 (E.D. Ark. 2022) (granting summary judgment in favor of Arkansas official on manufacturers' claim that Arkansas law was preempted), *aff'd* 95 F.4th 1136 (8th Cir. 2024), *cert. denied* 145 S.Ct. 768 (2024); *but see AstraZeneca Pharms. LP v. Harris,* No. 4:24-cv-00268-KGB (E.D. Ark. Sept. 30, 2025), ECF No. 141 (denying judgment on the pleadings as to manufacturer's claim that Arkansas law violated Takings Clause); *PhRMA v. Morrisey,* 760 F. Supp. 3d 439, 452–60 (S.D.W. Va. 2024) (granting preliminary injunction as to West Virginia law and denying the defendants' motion to dismiss).

that 340B profits go," which, according to AbbVie, "is not to charity care, to uncompensated care, or to benefit patients." (*Id.* at 20:7–11; *see also* ECF No. 36-1.)

Defendants, for their part, proffered testimony from "two witness who work for Colorado hospital systems that are 340B covered entities," both of whom were called to generally testify "about how their systems have been impacted by the drug company restrictions and how they expect it to change under the new law." (ECF No. 111 at 23:13–14.) Those witnesses included Dr. Kevin Forbush, "a pharmacist who runs the 340B program at Intermountain Health," and Kevin Stansbury, the CEO of Lincoln Health, "a county governmental hospital system" located in the rural town of Hugo, Colorado. (*Id.* at 23–25.)

The Court refers to some of that hearing evidence where relevant to its analysis below. But ultimately, it finds it unnecessary to recount much of the testimony put forth at the evidentiary hearing. In general, the Court concurs with Defendants' view that the testimony presented a compelling case that Section 340B is in dire need of legislative reform, but it did not significantly move the needle on the issues immediately before the Court—namely, whether AbbVie is substantially likely to succeed in demonstrating that the Act is preempted by federal law or effects an unconstitutional taking.

## II.    LEGAL STANDARD

"Because a preliminary injunction is an 'extraordinary remedy never awarded as of right,'. . . the movant must make a 'clear and unequivocal' showing it is entitled to such relief." *Colorado v. U.S. Envtl. Protection Agency,* 989 F.3d 874, 883 (10th Cir. 2021) (quoting *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 24 (2008)); *Port City Props. v. Union Pac. R.R. Co.,* 518 F.3d 1186, 1190 (10th Cir. 2008) (internal citation

omitted)). "To obtain a preliminary injunction, the movant must show (1) it 'is

substantially likely to succeed on the merits,' (2) it 'will suffer irreparable injury if the

injunction is denied,' (3) its 'threatened injury outweighs the injury the opposing party

will suffer under the injunction,' and (4) 'the injunction would not be adverse to the public

interest.'" *Colorado,* 989 F.3d at 883 (quoting *New Mexico Dep't of Game & Fish v.

U.S. Dep't of Interior,* 854 F.3d 1236, 1246 (10th Cir. 2017)). The third and fourth

factors merge when the government is the opposing party. *Denver Homeless Out Loud

v. Denver, Colorado,* 32 F.4th 1259, 1278 (10th Cir. 2022) (citation omitted).

### III.   ANALYSIS

AbbVie contends that the Act is unconstitutional because (1) it is preempted by

federal law pursuant to the Supremacy Clause and/or (2) it effects a taking in violation

of the Takings Clause. (*See generally* ECF Nos. 7, 43.) For the reasons explained

below, the Court finds that AbbVie has not established a substantial likelihood of

success on the merits of either claim. Accordingly, the Court does not proceed to

consider the remaining preliminary injunction factors. *See Vill. of Logan v. U.S. Dep't of

Interior,* 577 F. App'x 760, 766 (10th Cir. 2014) (a "plaintiff's failure to prove any one of

the four preliminary injunction factors renders its request for preliminary injunctive relief

unwarranted"); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256,

1266 n. 8 (10th Cir. 2004) (concluding "the other preliminary injunction factors" "need

not [be] address[ed]" after finding against the movant on one factor).

### A.   Preemption

"Congress has the power to preempt state law" pursuant to the Supremacy

Clause, which "provides a clear rule that federal law 'shall be the supreme Law of the

Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Arizona v. United States,* 567 U.S. 387, 399 (2012) (quoting U.S. Const., Art. VI, cl. 2.)  "[A]ny preemption inquiry begins with the presumption that federal law does not override 'the historic police powers of the States,' without the 'clear and manifest' intent of Congress."  *Bradshaw v. Am. Airlines, Inc.,* 123 F.4th 1168, 1173 (10th Cir. 2024) (quoting *Arizona,* 567 U.S. at 400).  Thus, congressional intent is "the ultimate touchstone in every pre-emption case."  *Wyeth v. Levine,* 555 U.S. 555, 565 (2009) (citation omitted).

"The party claiming preemption . . . bears the burden of showing with specificity that Congress intended to preempt state law."  *Day v. SkyWest Airlines,* 45 F.4th 1181, 1184 (10th Cir. 2022) (internal citation and quotation marks omitted).  "Congress's intent to preempt state law can be shown 'through a statute's express language' or implied 'through its structure and purpose.'"  *Bradshaw,* 123 F.4th at 1173 (quoting *Altria Grp., Inc. v. Good,* 555 U.S. 70, 76 (2008)).  Here, AbbVie does not argue that Section 340B expressly preempts the Act.  (*See generally* ECF No. 7.)  Instead, it contends that the Act is impliedly "preempted because it intrudes on a federal field and conflicts with the text and purpose of the 340B statute."  (*Id.* at 7.)

Notably, categories of preemption are not "rigidly distinct."  *English v. Gen. Elec. Co.,* 496 U.S. 72, 79 n.5 (1990).  "Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent . . . to exclude state regulation."  *Id.*  That sentiment rings true here, where it is, at times, difficult to distinguish between AbbVie's arguments in support of its field preemption and conflict preemption theories.  Nevertheless, the Court

11

endeavors to disentangle those arguments and address AbbVie's field and conflict preemption theories separately below.

1.    Field Preemption

Field preemption "exists where 'a framework of regulation' of a field is 'so pervasive' that it leaves no space for state supplementation or where the federal interest is 'so dominant' that the existence of a federal scheme can 'be assumed to preclude enforcement of state laws on the same subject.'" *Bradshaw,* 123 F.4th at 1173 (quoting *Arizona,* 567 U.S. at 399). AbbVie has not demonstrated that it is substantially likely to succeed in demonstrating that either inference applies here.

At the outset, AbbVie argues that Congress intended to preempt the field because, through Section 340B, it created "a single comprehensive federal scheme that governs every detail" of "the federally occupied 340B field," "from covered-entity eligibility to manufacturer obligations and enforcement . . . ." (ECF No. 7 at 7–8 (emphasis added).) Though AbbVie's briefing does not specifically define the "340B field," AbbVie's counsel seemed to affirm at the evidentiary hearing that it views the relevant regulatory field quite broadly: "the field of the 340B program, itself." (ECF No. 111 at 290:1–4.)

But it cannot be that Congress has enacted a scheme that governs "every detail" of the 340B Program. *Four* federal Circuit Courts of Appeal now concur that Section 340B "is silent about delivery," *Sanofi Aventis,* 58 F.4th at 703; *Novartis Pharms.,* 102 F.4th at 461 ("agree[ing] entirely"); *McClain,* 95 F.4th at 1143 (relying on *Sanofi Aventis*), and thus "regulates neither the distribution of drugs to patients nor the role of pharmacies in this distribution," *Fitch,* 152 F.4th at 646. The Court is further inclined to

12

think that the manner of distribution of 340B drugs to patients is a relevant "detail" of the 340B Program of which Congress is well-aware, given that (1) "[p]harmacies have always been an essential part of the 340B Program" and (2) Congress did "directly address distribution by third-party wholesalers." *McClain,* 95 F.4th at 1143 (citing 42 U.S.C. § 256b(a)(8)); *see also Fitch,* 152 F.4th at 646 ("Congress 'knew how to impose delivery-related requirements' and regulate distribution, because Section 340B does authorize distribution of drugs by manufacturers and third-party wholesalers." (quoting *Sanofi Aventis,* 58 F.4th at 704)). That "Congress chose not regulate distribution to patients . . . indicat[es] that it did not intend to occupy the entire field in this area." *Fitch,* 152 F.4th at 646.

Second, AbbVie suggests that there is necessarily a field preemption issue because the Act "could not exist but for the *federal* 340B statute." (ECF No. 7 at 8 (emphasis in original); *see also* ECF No. 111 at 290:1–4 (arguing that the Act facially "targets the regulation of a federal program, and that intrudes on a federal field").) The Court presumes that AbbVie endeavors to show through this argument that there is a "federal interest . . . 'so dominant' that the existence of a federal scheme can 'be assumed to preclude enforcement of state laws on the same subject." *Bradshaw,* 123 F.4th at 1173 (quoting *Arizona,* 567 U.S. at 399).

AbbVie failed to direct the Court to any authority related to this argument in its Motion. (*See id.*) However, in its reply, AbbVie cited two authorities for the somewhat-related proposition that "there is no presumption against preemption where a state law explicitly depends on a federal statute": *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341 (2001) and *Boyle v. United Techs. Corp.,* 487 U.S. 500 (1988). (ECF No. 36

13

at 4–5.)  Moreover, at the evidentiary hearing, AbbVie's counsel likened the Act to an impermissible state "regulation of a federal instrumentality, like in *McCulloch v. Maryland*."  (ECF No. 111 at 289:10–15.)

*Buckman* and *Boyle* may be a closer fit for AbbVie's argument that the Act is in tension with Section 340B's enforcement scheme, but those authorities do not support the broad contention that there is necessarily a field preemption issue where "a state law explicitly depends on a federal statute."  (ECF No. 36 at 4.)  Rather, the Supreme Court held in those cases that state-law causes of action were impliedly preempted by federal common law because there was a "uniquely federal interest" at stake, like "the civil liabilities arising out of the performance of federal procurement contracts," *Boyle,* 487 U.S. at 506 (government contractors immune from liability under state tort law), or "the relationship between a federal agency and the entity it regulates," *Buckman,* 531 U.S. at 347 (state tort law fraud-on-the-FDA claims impliedly preempted).  AbbVie has not identified a "uniquely federal interest" here.

This case is also unlike *McCulloch v. Maryland,* where the direct subject of state regulation was itself a federal instrumentality.  17 U.S. 316 (1819).  Here, it is the non-governmental participants and beneficiaries of the 340B Program—namely, pharmaceutical manufacturers and covered entities—that are the subject of state regulation.  And "the Supreme Court . . . has never adopted a categorical rule that requires a finding of preemption whenever a state law is directly addressed to those participating in a federal program where the federal statute does not rely on the state to implement the program."  *AbbVie Inc. v. Frey,* 2025 WL 2813787, at *10 (D. Me. Sept. 23, 2025).  To the contrary, "matters left unaddressed in [] a [federal] scheme are

14

presumably left subject to the disposition provided by state law."  *O'Melveny & Myers v. F.D.I.C.,* 512 U.S. 79, 85 (1994).

The fundamental problem with AbbVie's argument that the Act is preempted because it depends on a federal statute is that it is backwards.  As the Court understands it, AbbVie essentially argues that "the existence of a federal scheme" necessarily establishes there is a sufficiently dominant "federal interest" from which it can be assumed that Congress intended to "preclude enforcement of state laws on the same subject."  *Bradshaw,* 123 F.4th at 1173 (citation omitted).  But that is not the law, and AbbVie cannot circumvent its burden to identify a compelling federal interest warranting preemption by pointing to the mere existence of a federal statute.

Lastly, AbbVie argues that the Act "goes to the very heart of the federally occupied field: [i]t overrides the *offer* structure Congress established, eliminates manufacturers' federally permitted discretion, and dictates the terms under which entities receive discounted drugs."  (ECF No. 7 at 8.)  To the extent AbbVie is arguing that the relevant field is defined more narrowly—"the terms by which manufacturers must offer discounted drugs under the 340B program"—"there would still be no field preemption."  *Frey,* 2025 WL 2813787, at *8.  "[B]ecause 340B does not dictate many of the terms regarding manufacturers' obligation to offer and provide the drugs, the language of 340B is insufficient to imply a congressional intent to preclude all state regulation in the field."  *Id.* (citing *Sanofi Aventis,* 58 F.4th at 704 (observing, as to the terms of an offer, that the 340B statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank")).)  Congress's intent to preempt the field cannot be inferred solely from the fact that it left certain "terms" to manufacturers'

15

discretion.  AbbVie's discretion to set those terms—namely, where it is willing to deliver

340B drugs—is derived from Congress's silence.  *See Novartis Pharms.,* 102 F.4th at

460 ("Section 340B is . . . silent about delivery conditions.")  And "Congressional silence

will not be presumed to mandate preemption."  *Paul v. Monts,* 906 F.3d 1468, 1475 n.8

(10th Cir. 1990) (internal citation and quotation marks omitted).

The counter inference to AbbVie's arguments is that the Act does not intrude on

a federal field but instead implicates "traditional general areas of state regulation," like

"public health," *Fitch,* 152 F.4th at 647 (citing *Gobeille v. Lib. Mut. Ins. Co.,* 577 U.S.

312, 325 (2016) (noting "the State's traditional power to regulate in the area of public

health")), and "the practice of pharmacy," *McClain,* 95 F.4th at 1143 (citation omitted).

The "assumption that the historic police powers of the States [are] not to be superseded

by the Federal Act unless that was the clear and manifest purpose of Congress," *Altria*

*Grp.,* 555 U.S. at 77 (citation omitted), "applies with greater force when the alleged

conflict is in an area traditionally occupied by the States," *Ramsey Winch Inc. v. Henry,*

555 F.3d 1199, 1204 (10th Cir. 2009).  At this stage, AbbVie has failed to adduce

sufficient evidence to persuade the Court that it is substantially likely to succeed in

demonstrating that (1) this presumption against preemption does not extend to the Act

in the first instance and/or (2) that the presumption is overcome by "a strong showing

that Congress intended preemption."  *Fitch,* 152 F.4th at 1144.

2.    Conflict Preemption

A state law provision will "also preempted if it conflicts with federal law, either

because (1) 'compliance with both federal and state regulations is a physical

impossibility,'" "or because the provision (2) 'stands as an obstacle to the

16

accomplishment and execution of the full purposes and objectives of' federal law."

*United States v. Supreme Court of New Mexico,* 839 F.3d 888, 918 (10th Cir. 2016)

(quoting *Arizona,* 567 U.S. at 399).

Here, AbbVie argues that the Act "stands as an obstacle" to Congress's

objectives for three reasons. (ECF No. 7 at 8–9; ECF No. 52 at 4.) Whether these

alleged conflicts are "a sufficient obstacle" to warrant a finding of conflict preemption "is

a matter of judgment, to be informed by examining the federal statute as a whole and

identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council,*

530 U.S. 363, 373 (2000).

    a.    *Enforcement*

AbbVie first contends that the Act "stands as an obstacle" to Congress's

objectives because it "contravenes HRSA's exclusive enforcement authority." (ECF

No. 7 at 8.) On this record, the Court is unpersuaded.

AbbVie asserts that "[f]ederal law vests enforcement solely in HHS and lays out

the precise tools available: audits, dispute resolution, and civil penalties." (*Id.* at 9

(citing §§ 256b(d)(l)(B)(v), (vi), (d)(3)).) By contrast, it notes that "[s]tate enforcement

mechanisms" under the Act include "civil suits by third parties, the Attorney General, or

the Board of Pharmacy." (*Id.*) AbbVie thus contends that the federal and state

enforcement frameworks are in direct conflict insofar as the Act vests enforcement

authority in actors *other* than HRSA.

Following the Supreme Court's decision in *Astra,* there can be little debate that

Section 340B decidedly does *not* authorize a private right of action for violations of the

federal statute. Indeed, the parties conceded in that case that covered entities had "no

[private] right to sue for overcharges under [§ 340B] itself," and the Supreme Court

proceeded to hold "that suits by [covered] entities to enforce ceiling-price contracts [the

PPAs] running between drug manufacturers and the Secretary of HHS [were also]

incompatible with the statutory regime."  563 U.S. at 113.

But this does not end the inquiry.  "'Conflict is imminent' when 'two separate

remedies are brought to bear *on the same activity*.'"  *Crosby,* 530 U.S. at 373 (quoting

*Wis. Dep't of Indus. v. Gould, Inc.,* 475 U.S. 282, 286 (1986)) (emphasis added); *see*

*also Arizona,* 567 U.S. at 402 ("Permitting the State to impose its own penalties for the

*federal offenses* here would conflict with the careful framework Congress adopted."

(emphasis added)).  AbbVie has identified two separate remedies, but it does not

discuss in its briefing the activities those remedies are intended to redress.

Numerous federal courts have now considered the same argument that AbbVie

sets forth here, and nearly all have found that state law enforcement schemes like that

found in the Act "do[] not conflict with Section 340B's enforcement scheme."  *E.g., Fitch,*

152 F.4th at 647.  Though "true that Congress made HHS the sole enforcer of Section

340B," the Fifth and Eighth Circuits reasoned that the comparable state laws before

them "d[id] not intrude upon this authority because [they did] not impose penalties for

*violations of Section 340B*, like failing to offer discounted drugs to covered entities or

engaging in diversion."  *Id.* at 647–48 (emphasis added); *McClain,* 95 F.4th at 1144

("HHS has jurisdiction over different disputes: disputes between covered entities and

manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to

those who do not qualify for discounted drugs.").  Rather, the state laws "impose[d]

penalties when drug manufacturers [*violated the state law*] by interfering with the

18

distribution of Section 340B drugs pursuant to covered entities' partnerships with contract pharmacies."  *Fitch,* 152 F.4th at 648; *McClain,* 95 F.4th at 1145 (reasoning the Arkansas law's penalties were aimed at "deterring pharmaceutical manufacturers from interfering with a covered entity's contract pharmacy arrangements").  Put simply, the state law penalties were "aimed at activity that falls outside the purview of 340B." *McClain,* 95 F.4th at 1145.

The same is true of the Act here.  *See* § 6-9-105(3)(a) ("A person that violates *this [Act]* . . . is subject to the enforcement provisions, civil penalties, and damages set forth in Article 1 of this Title 6." (emphasis added)).

Nevertheless, at the evidentiary hearing, AbbVie highlighted that, in response to regulatory comments from stakeholders like Dr. Forbush, HRSA recently modified the 340B Administrative Dispute Resolution Regulation to explain that the 340B ADR Panel is permitted to hear "[c]laims by a covered entity that it has been overcharged by a manufacturer for a covered outpatient drug, including claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price."  89 Fed. Reg. 28,643, 28,657 (Apr. 19, 2024).  (*See also* ECF No. 111 at 105–108.)  Dr. Forbush agreed during his testimony that he, personally, "wanted the government to clarify that it counts as an overcharge of a drug when a manufacturer imposes limits or conditions on a covered entity's ability to purchase drugs at the 340B price."  (*Id.* at 105:24–106:3.)

Notably, though, HRSA expressly declined to promulgate "an explicit definition of the term 'overcharge,'" instead choosing to explain only that "[w]hen an overcharge claim is presented before a 340B ADR Panel, the Panel will follow the 340B statute" and

"relevant case law," among other sources.  89 Fed. Reg. at 28,649.  Given the Third

and D.C. Circuits have held that manufacturers do not violate Section 340B when they

restrict a covered entity's ability to distribute drugs to patients through contract

pharmacies, it is difficult to see how that conduct "could be challenged as a limitation on

the ability to purchase drugs at or below the ceiling price *under federal law*" before the

ADR Panel.  *Frey,* 2025 WL 2813787, at *11 (emphasis added).  At the very most, "the

alleged conflict is too speculative" at this stage "to support a finding that [AbbVie] is

likely to prevail on [its] claim" that the Act is preempted because it contains a conflicting

enforcement mechanism.  *Id.*

For these reasons, the Court concludes that AbbVie has not demonstrated a

likelihood of success on the merits of its preemption claim based on a purported conflict

between the enforcement mechanisms of Section 340B and the Act.

b.     *340B Drug Pricing*

Next, AbbVie argues that Section 340B and the Act are in conflict because, "like

the federal statute, [the Act] regulates *pricing,* not 'delivery' . . . ."  (ECF No. 7 at 9.)  The

Court is unpersuaded.

Much of AbbVie's argument originates with the Act's definition of a "340B drug,"

which is as follows:

> . . . a drug that:
>
> (a)     Is a covered outpatient drug within the
> meaning set forth in 42 U.S.C. sec. 256b;
>
> (b)     Has been subject to any offer for reduced
> prices by a manufacturer pursuant to 42 U.S.C. sec.
> 256b(a)(1);

>      (c)      Is purchased by a covered entity.  As used in
> this subsection (2)(c), a drug is considered "purchased" if it
> would have been purchased but for the restriction or
> limitation described in section 6-29-105.

§ 6-29-103(2) (emphasis added).

First, AbbVie argues that the Act "by its very text cannot escape the word 'price.'" (ECF No. 7 at 9.)  However, as concisely put by the *Amici,* "[t]he fact that [the Act] includes 'the word price' . . . does not mean that it *regulates* price."  (ECF No. 34-1 at 7 (emphasis in original).)  Indeed, the cited definition makes clear that the price is set "*pursuant to [Section 340B]*."  § 6-29-103(2)(b) (emphasis added); *cf., e.g., McClain,* 95 F.4th at 1145 (concluding substantially similar Arkansas statute "does not set or enforce discount pricing"); *PhRMA v. Murrill,* 2024 WL 4361597, at *9 (W.D. La. Sept. 30, 2024) ("[D]iscounts are set by the federal government, not the State of Louisiana or Act 358."); *AbbVie Inc. v. Skrmetti,* 2025 WL 1805271, at *18 (M.D. Tenn. June 30, 2025) ("The amount of the discount is not at issue and is not affected by the state scheme.").

Second, AbbVie emphasizes that the Act defines a 340B drug as inclusive of one that "*would have been purchased* but for the restriction or limitation" imposed by AbbVie's policy.  § 6-29-103(2) (emphasis added).[6]  In this way, the Court understands AbbVie to argue that the Act conflicts with Section 340B because it compels AbbVie to make sales it otherwise would have refused to make by "attach[ing] 340B discounts to drugs shipped to for-profit pharmacies or other 'authorized' locations."  (ECF No. 7 at 9.)

---

[6] In substantial part, this argument appears to be a repackaging of AbbVie's argument that Congress has preempted the field when it comes to the terms that manufacturers may or may not attach to their offers of 340B drugs.  The Court's analysis as to that issue above applies with equal force to the extent AbbVie bases its conflict preemption claim on the same grounds. (*See* Section III.A.1 *infra.*)

Put still another way, AbbVie insists that the Act conflicts with Section 340B because it

"grants contract pharmacies expanded access to 340B pricing."  (ECF No. 36 at 3.)

Like the Fifth Circuit, the Court understands AbbVie's concern is that the

involvement of contract pharmacies comes with an increased risk of abuse of the 340B

Program.  *See Fitch,* 152 F.4th at 648 (noting AbbVie's grievance is that "it believes that

when covered entities are allowed to distribute Section 340B drugs via contract

pharmacies, those contract pharmacies cause covered entities to place orders for larger

quantities of discounted drugs than they are actually entitled to, and the contract

pharmacies then improperly resell those discounted drugs in ways that increase their

profits").  But, to again borrow the words of the Fifth Circuit, AbbVie's suggestion that

the Act facially requires it to sell 340B drugs to non-covered entities

> is simply incorrect.  [The Act] does not expand Section
> 340B's list of covered entities to include contract
> pharmacies.  By its plain text, [the Act] requires drug
> manufacturers to give custody of discounted drugs to
> contract pharmacies only insofar as they have partnered with
> covered entities to distribute the drugs to patients.  It does
> not compel manufacturers to 'offer' discounted drugs to
> contract pharmacies in the way that Section 340B compels
> them to 'offer' these drugs to covered entities.

*Id.* at 647.  On this record, the Court is further unconvinced that the Act will have the

practical effect of requiring AbbVie to make sales to non-covered entities in conflict with

Section 340B, such that a preliminary injunction is warranted.  *Cf. id.* at 648 ("AbbVie is

essentially alleging that the real problem with [the Mississippi law] is not a *feature* of the

law, but rather a *bug.*  And on this record, we cannot say that this potential bug in [the

state law] merits a preliminary injunction.").

For these reasons, the Court also concludes that AbbVie has not demonstrated a substantial likelihood of success on the merits of its preemption claim based on its assertion that, like Section 340B, the Act purports to regulate pricing.

   c.  *Pilot Program*

Third, AbbVie avers that the Act's claims data restriction conflicts with the impending 340B Rebate Model Pilot Program ("the "Pilot Program""), which HRSA announced shortly after AbbVie filed the Motion.  (ECF No. 52 at 2.)  *See also* 90 Fed. Reg. 36,163 (Aug. 1, 2025).

As pertinent background, AbbVie explains that the Pilot Program concerns the interplay between the 340B Program and the Inflation Reduction Act's Drug Price Negotiation Program ("DPNP"), 42 U.S.C. §§ 1320f *et seq.*  (*Id.*)  Whereas the 340B Program "requires manufacturers to offer drugs to certain 'covered entities' at a statutorily calculated 'ceiling price,'" the DPNP "requires HHS to set a 'maximum fair price' ('MFP') for certain selected drugs," which manufacturers must then make "available to certain Medicare-covered individuals at the MFP."  (*Id.* (citing §§ 1320f(a)(3), (c)(2), 1320f-2(a)(3)).)  Under the DPNP's "nonduplication" provision, manufacturers must provide the lower of the two price concessions—the 340B ceiling price or the MFP—but not both.  (*Id.* (citing § 1320f-2(d)).)  According to AbbVie, manufacturers, rather than HHS, "shoulder the task" of "identifying and deduplicating 340B dispenses."  (*Id.*)

In response to "widespread concern about the nonduplication and compliance problems" facing manufacturers, AbbVie states that "HRSA announced the Pilot Program to test a rebate model for effectuating the 340B price to covered entities."  (*Id.*

(citing 90 Fed. Reg. at 36,163–65).)  As pertinent here, the Pilot Program allegedly

permits "manufacturers . . . to request from covered entities—and covered entities are

expected to provide—claims data" to better enable manufacturers "[t]o determine which

price concession (if any) is appropriate" under the new rebate model.  (*Id.* at 3.)  AbbVie

believes that the Act poses a barrier to its participation in the Pilot Program because it

restricts manufacturers "from requiring 340B covered entities and contract pharmacies

to 'submit any health information, claims or utilization data, purchasing data, payment

data, or other data.'"  (ECF No. 52 at 3 (quoting § 6-29-105(b)).)[7]

The Court is not persuaded.  Even setting aside the standing and ripeness issues

Defendants raised (ECF No. 74 at 2), there appears to be no conflict between the Act's

plain text and the Pilot Program as far as claims data is concerned.  AbbVie selectively

quoted the Act's prohibitory language on the collection of claims data but ignored its

further qualification that the prohibition applies "*unless such data is . . . otherwise

required to be furnished under applicable federal law.*"  § 6-29-105(1)(b) (emphasis

added).  This caveat is further reinforced by § 6-29-105(5), which provides:

> (5) **Data exclusions.**  Subsection (1) of this section does not
> prohibit a manufacturer from requiring health information or
> other data that a covered entity is required to furnish to the
> manufacturer under applicable federal law, including data
> relating to an audit in accordance with procedures
> established by the Federal Department of Health and Human
> Services under 42 U.S.C. § 256b(a)(5)(C).

§ 6-29-105(5).

---

[7] Just before the Court issued this Order, AbbVie filed a notice informing the Court that HRSA had "officially approved" its application to participate in the Pilot Program, which is expected to commence on January 1, 2026.  (ECF No. 112.)

Thus, to the extent the Pilot Program requires covered entities to provide certain claims data, it appears at this point that the Act poses no barrier. For at least this reason, the Court easily concludes that AbbVie has also not established a substantial likelihood of success in demonstrating the Act "stands as an obstacle" to the implementation of the Pilot Program.

**B.    Takings Clause**

AbbVie's second claim is that the Act runs afoul of the Takings Clause "because it compels AbbVie and other manufacturers to make sales at 340B-discounted prices under terms they would otherwise never agree to." (ECF No. 7 at 11.)

"The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides: '[N]or shall private property be taken for public use, without just compensation.'" *Cedar Point Nursery v. Hassid,* 594 U.S. 139, 147 (2021). As a general matter, a government taking may occur when the government "physically acquires private property for a public use," or where, "rather than appropriate private property for itself or a third party," the government "instead imposes regulations that restrict an owner's ability to use his own property." *Id.* at 147–48. In the Motion, AbbVie appears to argue only the former—that the Act effects a *per se* taking of its private property. (*See* ECF No. 36 at 8–9 (discussing Supreme Court authority holding that "when there has been a physical appropriation, 'we do not ask . . . whether it deprives the owner of all economically valuable use' of the item taken," *Horne v. Dep't of Agriculture,* 576 U.S. 350, 363 (2015) (internal citation omitted)).) Accordingly, the Court does not analyze herein whether the Act effects a taking as a "use restriction" under the *Penn Central* test. *Cedar Point,* 594 U.S. at 148.

25

Critically, "[a] demand for personal property" is not a taking where "it involve[s] a voluntary exchange for a government benefit." *Valancourt Books, LLC v. Garland,* 82 F.4th 1222, 1232 (D.C. Cir. 2023). So long as "the property owner is 'aware of the conditions' of an exchange," "the conditions are 'rationally related to a legitimate Government interest,'" and "the purported 'benefit' is [not] illusory," "presenting the exchange poses no takings problem." *Id.* (quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1007 (1984)); *see also Baker County Med. Servs., Inc. v. U.S. Atty. Gen.,* 763 F.3d 1274, 1276 (11th Cir. 2014) (collecting cases "instruct[ing] that no taking occurs where a person or entity voluntarily participates in a regulated program or activity").

As especially pertinent here, numerous Circuit Courts of Appeal have found that regulatory requirements imposed as a condition of participation in Medicaid and Medicare do not effect a taking. *See, e.g., Baker County Med. Servs.,* 763 F.3d at 1279 (rejecting hospital's takings challenge to "its rate of compensation in a regulated industry for an obligation it voluntarily undertook . . . when it opted into Medicare and became subject to" federal statute requiring hospitals to treat all people who seek treatment in emergency departments); *Burditt v. U.S. Dep't of Health & Hum. Servs.,* 934 F.2d 1362, 1376 (5th Cir. 1991) (similar); *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Public Health Welfare,* 742 F.2d 442, 446 (8th Cir. 1984) (nursing home's voluntary decision to participate in Medicaid "forecloses the possibility that the statute could result in an imposed taking of private property").

Extending that rationale to the precise circumstances here, courts have found that the voluntariness of the 340B program poses an obvious impediment to pharmaceutical manufacturers' Takings Clause challenges to state legislation like the

26

Act.  *See, e.g., Frey,* 2025 WL 2813787, at *14 ("Because AbbVie can choose not to

participate in the 340B program, AbbVie has not demonstrated a likelihood of success

on its takings claim."); *AstraZeneca Pharms. LP v. Bailey,* 2025 WL 644285, at *4 (W.D.

Mo. Feb. 27, 2025) ("Plaintiff voluntarily chose to participate in a federal program, and

as Eighth Circuit precedent has noted, it forecloses the possibility that the federal 340B

program, or S.B. 751, results in an imposed taking of private property which would give

right to the constitutional right to just compensation.").  The Court agrees and adopts the

rationale of these decisions, and finds AbbVie's voluntary participation in the 340B

program, at least at this early juncture of these proceedings, to present a nearly

insurmountable obstacle to the success of their Takings claim.

Still, while AbbVie acknowledges that "[v]oluntarily accepting a government

benefit in exchange for giving up property rights can extinguish a takings claim against

the government who conferred the bargained-for benefit," it argues that its voluntarily

participation in a federal program "cannot justify separate state-imposed requirements

where no state benefit is conferred."  (ECF No. 7 at 13.)  The authorities upon which

AbbVie relies to support this assertion, however, are inapposite.

In *Valancourt Books,* the D.C. Circuit concluded that a provision of the *federal*

Copyright Act "requiring copyright owners to provide physical copies of books" effected

a taking because "copyright owners receive[d] no additional benefit for the works they

forfeit[ed] pursuant to [the] deposit requirement."  82 F.4th at 1232.  The D.C. Circuit

reasoned that "[m]andatory deposit is not required to secure the benefits of copyright."

*Id.*  Rather, authors obtained the benefit of copyright immediately upon fixation of the

work, and the "mandatory deposit [provision] grant[ed] no additional benefits."  *Id.* at

27

1233.  Unlike copyright protection, however, AbbVie has no automatic right to receive the benefits incidental to its participation in Medicare and Medicaid.  And it cites no case law supporting that each time the government (whether federal or state) imposes a new regulatory requirement upon Medicaid and Medicare participants, it must *also* confer some increased "benefit" of participation.  *Cf. Frey,* 2025 WL 2813787, at *14 ("AbbVie does not provide any persuasive authority to support the contention that each new regulatory condition must be accompanied by a separate benefit to maintain the voluntary nature of the program for purposes of a takings claim").

*Virginia Hospital & Healthcare Association v. Roberts* is also distinguishable. 671 F. Supp. 3d 633 (E.D. Va. 2023)*.*  There, the plaintiffs' Takings Clause claim was based on the contention that the Virginia program at issue "legally compelled [them] to participate in Medicaid and Medicare programs."  *Id.* at 666;[8] *see also Garelick v. Sullivan,* 987 F.2d 913, 917 (2d Cir. 1993) (where the plaintiffs argued the voluntary participation doctrine was inapplicable "because New York law compels them to render services to Medicare beneficiaries").  Here, AbbVie does not argue that the Act purports to compel its participation in the 340B Program.  To the contrary, it has affirmed that it remains free, in its sole discretion, to withdraw from the Program.  (ECF No. 111 at 261:4–7 ("one day laws like this are going to force manufacturers to withdraw on a manufacturers to withdraw on a nationwide basis Medicare and Medicaid"); *see also*

---

[8] Notably, the district court ultimately did "not fully determine whether Virginia's []
program amount[ed] to legal compulsion" because the plaintiffs' Takings Clause claim against
the state defendant was barred by the Eleventh Amendment in any event.  *Id.* at 667.
Defendants similarly raise an Eleventh Amendment issue here, though, as noted below, the
Court does not reach that issue.

ECF No. 98 (AbbVie's notice of supplemental authority informing the Court that "a large drug manufacturer announced that it will withdraw from both 340B and Medicaid next week").)  Though that would be an unfortunate result, it appears at this juncture that AbbVie has more likely identified a public policy issue, and not a Takings Clause violation.

For these reasons, and most importantly because AbbVie's participation in the 304B Program is wholly voluntary, the Court finds that AbbVie has not established a substantial likelihood of success in demonstrating that the Act effects a *per se* taking. Accordingly, the Court does not reach AbbVie's arguments that the Act runs afoul of the Takings Clause "public use" requirement, nor Defendants' argument that "AbbVie cannot bring a takings claim for injunctive relief against state officers in federal court." (ECF No. 33 at 10.)

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction (ECF No. 7) is DENIED.

Dated this 31st day of October, 2025.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge

29

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 25-cv-02685-PAB-STV

ASTRAZENECA PHARMACEUTICALS LP,

      Plaintiff,

v.

PHILIP J. WEISER, in his official capacity as the Attorney General of the State of
Colorado, et al.,

      Defendants.

---

**ORDER**

---

    This matter comes before the Court on Plaintiff's Motion for a Preliminary Injunction

[Docket No. 25], wherein plaintiff seeks an injunction enjoining the Colorado 340B

Contract Pharmacy Protection Act, Colorado Revised Statutes §§ 6-29-101 *et seq.*

(2025) ("S.B. 71") from being enforced against it.  Defendants oppose plaintiff's motion.

Docket No. 48.  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND

     In 1992, Congress created the so-called Section 340B program by enacting

§ 340B of the Public Health Service Act, 42 U.S.C. § 256b ("Section 340B").  *Astra*

*USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 113 (2011).  Section 340B "imposes

ceilings on prices drug manufacturers may charge for medications sold to specified

health-care facilities."  *Id.*  The Section 340B program was created "to ensure that

uninsured and low-income individuals can access the medications they need and to

ensure that medical providers serving these individuals receive crucial subsidies."

*AbbVie, Inc. v. Fitch*, 152 F.4th 635 (5th Cir. 2025).  The specified health-care facilities

are known as "covered entities" and "include public hospitals and community health

centers" which often provide "safety-net services to the poor." *Astra*, 563 U.S. at 113.

The Section 340B program "is superintended by the Health Resources and

Services Administration (HRSA), a unit of the Department of Health and Human

Services (HHS). Drug manufacturers opt into the 340B Program by signing a form

Pharmaceutical Pricing Agreement (PPA) used nationwide." *Id.* PPAs are "uniform

agreements that recite the responsibilities § 340B imposes." *Id.* One of these

responsibilities requires that manufacturers "offer each covered entity covered

outpatient drugs for purchase at or below the applicable ceiling price if such drug is

made available to any other purchaser at any price." 42 U.S.C. § 256b(a)(1). Drug

manufacturers cannot participate in Medicaid and Medicare Part B unless they

participate in the Section 340B program. *Astra*, 563 U.S. at 113.

Section 340B also places certain restrictions on covered entities. *See* 42 U.S.C.

§ 256b(a)(5)(A)-(D); *see also Fitch*, 152 F.4th at 640 (listing the restrictions that Section

340B places on covered entities). Covered entities are forbidden to seek "duplicate

discounts or rebates," meaning they cannot seek a Section 340B discount and a

Medicaid rebate on the same drug. 42 U.S.C. § 256b(a)(5)(A). Covered entities are

also forbidden from reselling or transferring a covered drug to a person who is not a

patient of the covered entity. 42 U.S.C. § 256b(a)(5)(B). To ensure compliance with

these restrictions, covered entities must permit the Secretary of Health and Human

Services and the manufacturer of covered drugs to audit their records. 42 U.S.C.

§ 256b(a)(5)(C). If a covered entity fails to comply with these restrictions, it will be liable

2

to the drug manufacturer for the amount improperly received.  42 U.S.C.

§ 256b(a)(5)(D).

Since Section 340B was first enacted, "covered entities have contracted with

outside pharmacies, referred to as 'contract pharmacies,' for the distribution and

dispensation of 340B drugs.  This is in large part due to the fact that building or

maintaining a pharmacy is cost-prohibitive for many covered entities.  Additionally, the

outsourcing of pharmacy services has allowed for drug dispensation closer to where

low-income patients reside." *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95

F.4th 1136, 1139 (8th Cir. 2024).

In 1996, HRSA issued guidance stating its belief that Section 340B is silent

regarding how covered drugs were to be distributed, and that silence created a gap in

the legislation.  *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456-57 (D.C. Cir.

2024) (citing Notice Regarding Section 602 of the Veterans Health Care Act of 1992;

Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,549-50 (Aug. 23, 1996) ("1996

Guidance")).  Seeking to fill that gap, "HRSA stated that a covered entity without an in-

house pharmacy may contract with a single outside pharmacy to dispense drugs at a

single location."  *Id.* at 457 (citing 1996 Guidance at 43,555).  In 2010, HRSA issued

new guidance stating that "covered entities may contract with an unlimited number of

outside pharmacies and may do so regardless of whether the entities have in-house

pharmacies."  *Id.* (citing Notice Regarding 340B Drug Pricing Program—Contract

Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010) ("2010

Guidance")).  HRSA recognized that "contract pharmacies enable covered entities to

'create wider patient access by having more inclusive arrangements in their

communities.'"  *Id.* (quoting 2010 Guidance at 10,273).  "After the 2010 guidance, the

use of contract pharmacies skyrocketed."  *Sanofi Aventis U.S. LLC v. United States*

*Dep't of Health & Hum. Servs.*, 58 F.4th 696, 700 (3d Cir. 2023).

Drug manufacturers believed that the proliferative use of contract pharmacies

was increasing duplicate discounting and diversion.  *Id.*  Specifically, manufacturers

worried that the "replenishment model" used by many contract pharmacies to stock

Section 340B discounted drugs led to increased abuse of the Section 340B program.

Docket No. 25 at 4-5; *Johnson*, 102 F.4th at 457-58.  The D.C. Circuit explained how

the replenishment model operates and how it can potentially be abused by contract

pharmacies:

> While some contract pharmacies maintain separate inventories of section
> 340B drugs, most fill prescriptions from inventories that intermingle
> discounted and non-discounted drugs.  Only after dispensing the drugs do
> these pharmacies attempt to discern whether individual customers were
> patients of covered entities—in other words, whether individual
> prescriptions were eligible for the discount.  Many pharmacies outsource
> this determination to third-party administrators, who often receive a larger
> fee for every prescription deemed eligible for the discount.  Once the
> pharmacy or the administrator categorizes a certain number of
> prescriptions as eligible, the pharmacy places an order to replenish its
> section 340B purchases.  The covered entity, the pharmacy, and the third-
> party administrator often divvy up the spread between the discounted
> price and the higher insurance reimbursement rate.  Each of these actors
> thus has a financial incentive to catalog as many prescriptions as possible
> as eligible for the discount.

*Johnson*, 102 F.4th at 457-58.

In 2020, attempting to combat this alleged abuse, manufacturers adopted

policies limiting the use of contract pharmacies.  *Id.* at 458.  AstraZeneca

Pharmaceuticals LP ("AstraZeneca") was one of the manufacturers who adopted such a

policy, allowing 340B discounts at only a single designated contract pharmacy, and only

4

for covered entities that lack an in-house pharmacy.  Docket No. 25 at 5.  In response to these new policies by drug manufacturers, "HHS issued an advisory opinion stating that section 340B requires manufacturers to deliver covered drugs to any contract pharmacies with which a covered entity chooses to partner."  *Johnson*, 102 F.4th at 458.  Drug manufacturers challenged HHS's interpretations in court.  The Third Circuit and the D.C. Circuit held that Section 340B is silent about delivery, and therefore it does not require manufacturers to distribute discounted drugs to contract pharmacies.  *Id.* at 464; *Sanofi Aventis*, 58 F.4th at 707.  "HHS ultimately withdrew the advisory opinion." *Fitch*, 152 F.4th at 641.

"Soon after, several states passed laws to protect covered entities' partnerships with contract pharmacies, attempting to do by statute what HHS had done in its advisory opinion."  *Id.*  Nationwide, drug manufacturers have challenged these state statutes as unconstitutional; to date, courts have largely rejected those challenges.[1]

---

[1] *See Fitch*, 152 F.4th at 648 (affirming order denying preliminary injunction); *McClain*, 95 F.4th at 1146 (affirming order granting summary judgment to state); *Abbvie, Inc. v. Weiser*, No. 25-cv-01847-WJM-KAS, 2025 WL 3041825 (D. Colo. Oct. 31, 2025); *Novartis Pharms. Corp. v. Frey*, 2025 WL 2813787 (D. Me. Sept. 23, 2025) (denying preliminary injunction); *AbbVie Inc. v. Skrmetti*, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) (same); *AstraZeneca Pharms. LP v. Bailey*, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) (granting in part and denying in part state's motion to dismiss, with denial limited to contract clause argument); *Novartis Pharms. Corp. v. Bailey*, 2025 WL 595189 (W.D. Mo. Feb. 24, 2025) (denying preliminary injunction); *Pharm. Rsch. & Manufacturers of Am v. Murrill*, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) (granting summary judgment to state); *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657 (S.D. Miss. 2024) (denying preliminary injunction); *AbbVie Inc. v. Fitch*, 2024 WL 3503965 (S.D. Miss. July 22, 2024) (same), *aff'd*; *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024) (same); *Pharm. Rsch. & Manufacturers of Am v. Fitch*, 2024 WL 3277365 (S.D. Miss. July 1, 2024) (same); *but see Pharm. Rsch. & Manufacturers of Am v. Morrisey*, 760 F. Supp. 3d 439 (S.D. W. Va. 2024) (granting preliminary injunction); *AbbVie Inc. v. Drummond*, 2025 WL 3048929 (W.D. Okla. Oct. 31, 2025) (granting preliminary injunction in part).

Like many other states, Colorado passed a statute, Senate Bill 25-071, which requires drug manufacturers to deliver drugs discounted under Section 340B to unlimited contract pharmacies. *Weiser*, 2025 WL 3041825, at *3-4. Senate Bill 25-071 is now codified as the Colorado 340B Contract Pharmacy Protection Act, Colorado Revised Statutes §§ 6-29-101 *et seq.* (2025). *Id.* at *1. S.B. 71 took effect on August 6, 2025. *Id.* at *1 n.1. The statute prohibits manufacturers from doing the following:

> (a) Unless the receipt of the 340B drugs is prohibited by the federal department of health and human services, a manufacturer, third-party logistics provider, or repackager, or an agent, contractor, or affiliate of a manufacturer, third-party logistics provider, or repackager, including an entity that collects or processes health information, shall not, directly or indirectly, deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or a location otherwise authorized by a 340B covered entity to receive and dispense 340B drugs.
>
> (b) A manufacturer shall not directly or indirectly require, including as a condition, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or any other location authorized to receive 340B drugs by a 340B covered entity to submit any health information, claims or utilization data, purchasing data, payment data, or other data that does not relate to a claim submitted to a federal health care program, unless such data is voluntarily furnished by such covered entity or otherwise required to be furnished under applicable federal law.

Colo. Rev. Stat. § 6-29-105.

On August 27, 2025, plaintiff AstraZeneca filed this lawsuit against defendants Philip J. Weiser, in his official capacity as the Attorney General of the State of Colorado, and Kristen Wolf, Ryan Leyland, Patricia Evacko, Avani Soni, Michael Scruggs, Alexandra Zuccarelli, and Jayant Patel, in their official capacities as Members of the Colorado State Board of Pharmacy

6

("defendants"), to challenge the constitutionality of S.B. 71.[2]  Docket No. 1.  On

October 1, 2025, AstraZeneca filed a motion for a preliminary injunction seeking

to enjoin S.B. 71 from being enforced against it.  Docket No. 25.  On October

30, 2025, defendants filed a response.  Docket No. 48.  On November 10,

2025, AstraZeneca filed a reply.  Docket No. 57.  The Court heard argument on

the motion on December 2, 2025.  Docket No. 67.

## II.  LEGAL STANDARD

To succeed on a motion for a preliminary injunction, the moving party must show

(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer

irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips

in the movant's favor; and (4) that the injunction is in the public interest.  *RoDa Drilling

Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res. Def.

Council, Inc.*, 555 U.S. 7, 20 (2008)); *see Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir.

2010).  The third and fourth factors merge when the government is the opposing party.

*Denver Homeless Out Loud v. Denver, Colo.*, 32 F.4th 1259, 1278 (10th Cir. 2022)

(citation omitted).  If a court finds against the movant on one factor, the other factors

need not be addressed.  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356

F.3d 1256, 1266 n. 8 (10th Cir. 2004); *see also Vill. of Logan v. U.S. Dep't of Interior*,

577 F. App'x 760, 766 (10th Cir. 2014) (unpublished) (a "plaintiff's failure to prove any

---

[2] In its complaint, AstraZeneca brings claims that S.B. 71 is unconstitutional because it (1) is preempted by Section 340B; (2) is preempted by federal patent laws; (3) violates the Contracts Clause, U.S. Const. art. I § 10, cl. 1; and (4) violates the Takings Clause, U.S. Const., amend. V.  Docket No. 1 at 35-39, ¶¶ 112-131.  However, AstraZeneca only discusses the first two claims in its motion for a preliminary injunction. *See generally* Docket No. 25.  The Court assumes that its motion is limited to these claims.

one of the four preliminary injunction factors renders its request for preliminary injunctive relief unwarranted"). "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted). Granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989), "is the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

There are three types of preliminary injunctions that are disfavored: (1) injunctions that disturb the status quo, (2) injunctions that are mandatory rather than prohibitory, and (3) injunctions that provide the movant substantially all the relief it could feasibly attain after a full trial on the merits. *See Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1260 (10th Cir. 2005). In seeking a disfavored injunction, "the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (quotations, alterations, and citation omitted); *see also Schrier*, 427 F.3d at 1259 (stating that such injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course" (citation omitted)).

## III. ANALYSIS

AstraZeneca argues that S.B. 71 is preempted by Section 340B and by federal patent laws. Docket No. 25 at 2. First, AstraZeneca asserts that any presumption against preemption does not apply in this case. *Id.* at 7. Second,

it argues that Section 340B preempts S.B. 71 because (a) both laws regulate price; (b) S.B. 71 recalibrates the burdens and benefits of participating in Section 340B; (c) S.B. 71's enforcement regime conflicts with Section 340B's enforcement regime; and (d) S.B. 71's claims-data restriction conflicts with federal laws and regulations. *Id.* at 8-17. Third, AstraZeneca argues that S.B. 71 is preempted by federal patent laws because it diminishes the rewards to patentees by capping the price at which patented drugs may be sold.

In their response, defendants raise two arguments of their own: (a) that AstraZeneca does not have standing; and (b) that AstraZeneca is seeking a disfavored injunction. Docket No. 48 at 3-6. The Court will first address whether AstraZeneca has standing. *See Colorado Env't Coal. v. Wenker*, 353 F.3d 1221, 1227 (10th Cir. 2004) (stating that standing is jurisdictional).

### A. Standing

At its core, "standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, "a plaintiff must show: (1) that he has 'suffered an injury in fact'; (2) that the injury is 'fairly traceable to the challenged action of the defendant'; and (3) that it is 'likely' that the 'injury will be redressed by a favorable decision.'" *Am. Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist. RE-1*, 859 F.3d 1243, 1250 (10th Cir. 2017) (quoting *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133-34 (2011)). The party asserting federal jurisdiction has the burden of supporting each of these elements in "the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of

9

the litigation." *Lujan*, 504 U.S. at 561.  Thus, "[a]t the pleading stage, general

factual allegations of injury . . . may suffice." *Id.*

Defendants argue that AstraZeneca does not have standing because its alleged

injuries are not fairly traceable to S.B. 71.  Docket No. 48 at 5.  Defendants state that

AstraZeneca's injuries are traceable to its voluntary participation in Section 340B.  *Id.* at

5-6.  However, AstraZeneca alleges that S.B. 71 makes participation in Section 340B

more costly through its requirement to make Section 340B discounted drugs available at

unlimited contract pharmacies.  Docket No. 25 at 12.  AstraZeneca projects this will

result in it losing approximately $600,000 per month in sales.  Docket No. 25-1 at 7, ¶

28.

While these losses may ultimately stem from AstraZeneca's participation in

Section 340B, the Court finds that AstraZeneca is incentivized to participate in Section

340B because otherwise it cannot participate in Medicaid and Medicare Part B.  Thus,

making participation in Section 340B more costly is a "concrete and particularized"

injury that is fairly traceable to S.B. 71.  *See Lujan*, 504 U.S. at 560 (stating that an

injury in fact must be "concrete and particularized.") (citations omitted).  Defendants also

argue that any injury due to diversion or duplicate discounts is traceable to illegal

transfers of Section 340B drugs, and not to S.B. 71.  Docket No. 48 at 5.  However,

AstraZeneca alleges that illegal transfers of Section 340B drugs are more common in

contract pharmacies, and are thus made more common by S.B. 71.  Docket No. 25 at 4-

5.  Accordingly, the Court concludes that AstraZeneca has established that its injury is

fairly traceable to S.B. 71.  AstraZeneca therefore has standing to bring this action.

10

### B. **Disfavored Injunction**

Defendants argue that AstraZeneca is seeking a disfavored injunction because enjoining the enforcement of S.B. 71 would alter the status quo and because the relief AstraZeneca seeks is coterminous with the relief it seeks at trial. Docket No. 48 at 3-4. However, the Court finds that enjoining the enforcement of S.B. 71 would not alter the status quo. In the context of a disfavored injunction, "the status quo is the last uncontested status between the parties which preceded the controversy." *Schrier*, 427 F.3d at 1260 (internal quotations and citation omitted). Thus, "[i]n the context of a newly enacted statute challenged on constitutional grounds, the status quo is the period prior to the statute's enactment." *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1145 (W.D. Okla. 2024). Therefore, the status quo was the period before S.B. 71 was enacted. Enjoining its enforcement would not alter the status quo.

Furthermore, the relief AstraZeneca seeks in its preliminary injunction motion is not the same as the relief it seeks at trial. AstraZeneca seeks to preliminarily enjoin enforcement of S.B. 71 against it. Docket No. 25 at 2. It is true that AstraZeneca also wants the Court to find S.B. 71 unconstitutional, and thus unenforceable. Docket No. 1 at 39. However, this is not the same relief as preliminarily enjoining enforcement because a prohibition on enforcing S.B. 71 could be undone after trial. *See Black Emergency Response Team*, 737 F. Supp. 3d at 1145-46 (citing *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247-58 (10th Cir. 2001)) ("a preliminary injunction would not irreversibly afford Plaintiffs all the relief they could recover at trial, because a prohibition on enforcing the Act could be undone at the conclusion of a determination on the merits."). Therefore, the relief AstraZeneca seeks is not the same as the relief it seeks at trial. Accordingly, it is not seeking a disfavored injunction.

11

The Court will now analyze whether AstraZeneca has shown a likelihood of success on the  merits.

### C. <u>Preemption</u>

Article VI, cl. 2 of the Constitution—known as the Supremacy Clause—provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  "Under this principle, Congress has the power to preempt state law."  *Arizona v. United States*, 567 U.S. 387, 399 (2012).  If a federal law regulates something "inherently federal in character," no presumption against preemption applies.  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).  However, if a state law regulates in an area within the historic police power of the States, courts must assume that it is not preempted "unless that was the clear and manifest purpose of Congress."  *Arizona*, 567 U.S. at 400 (citation omitted).  "This makes congressional intent 'the ultimate touchstone in every pre-emption case.'"  *Bradshaw v. Am. Airlines, Inc.*, 123 F.4th 1168, 1173 (10th Cir. 2024) (citing *Wyeth v. Levine*, 55 U.S. 555, 565 (2009)).  Congress can demonstrate its intent to preempt expressly, through enacting a statute containing a preemption provision.  *Arizona*, 567 U.S. at 399.  Preemption can also by implied through a statute's "structure and purpose."  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).  Section 340B does not contain a preemption provision, so any preemption would have to be implied.

There are two types of implied preemption: field preemption and conflict preemption.  *Fitch*, 152 F.4th at 645.  Field preemption "exists where a 'framework of regulation' of a field is 'so pervasive' that it leaves no space for state supplementation or where the federal interest is 'so dominant' that the existence of a federal scheme can

12

'be assumed to preclude enforcement of state laws on the subject.'" *Bradshaw*, 123

F.4th at 1173 (citing *Arizona*, 567 U.S. at 399). "Conflict preemption occurs either when

compliance with both the federal and state laws is a physical impossibility, or when the

state law stands as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress." *Keith v. Rizzuto*, 212 F.3d 1190, 1193 (10th Cir.

2000) (internal quotation and citation omitted).

### D. Presumption Against Preemption

AstraZeneca argues that the presumption against preemption does not apply in

this case because S.B. 71 regulates something inherently federal in character. Docket

No. 25 at 7-8 (citing *Buckman*, 531 U.S. at 347). Specifically, AstraZeneca cites

*Buckman* to argue that, because S.B. 71 directly targets and depends on federal law,

namely, Section 340B, it regulates a uniquely federal interest beyond the States'

traditional police power. *Id.* However, *Buckman* "[does] not support the broad

contention that there is necessarily a . . . preemption issue where a state law explicitly

depends on a federal statute." *Weiser*, 2025 WL 3041825, at *7 (internal quotation

omitted).

In *Buckman*, the state law at issue attempted to police fraud against federal

agencies. *Buckman*, 531 U.S. at 347. The *Buckman* court determined that this was not

"a field which the States have traditionally occupied." *Id.* (citation omitted). Conversely,

public health is a matter within a state's traditional police powers. *See Medtronic, Inc. v.

Lohr*, 518 U.S. 470, 475 (1996) ("Throughout our history, the several States have

exercised their police powers to protect the health and safety of their citizens. Because

these are primarily, and historically, . . . matter[s] of local concern. The States

traditionally have had great latitude under their police powers to legislate as to the

13

protection of the lives, limbs, health, comfort, and quiet of all persons.") (citations and internal quotations omitted).  Thus, unlike the state law in *Buckman*, the state law here does not implicate a uniquely federal interest.  Accordingly, the presumption against preemption applies.

### E.  Whether S.B. 71 is Preempted by Section 340B

AstraZeneca asserts that S.B. 71 is preempted by Section 340B, noting that a state law is preempted if it "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  Docket No. 25 at 11 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)).  This is a conflict preemption argument.[3]  *See Keith*, 212 F.3d at 1193 ("Conflict preemption occurs . . . when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.") (citation and internal quotation omitted).  Specifically, AstraZeneca asserts that S.B. 71 is preempted by Section 340B because: (1) both laws regulate price; (2) S.B. 71 recalibrates Congress's balancing of the burdens and benefits of participating in Section 340B; (3) S.B. 71's enforcement regime conflicts with Section 340B's enforcement regime; and (4) S.B. 71's claims-data restriction conflicts with federal laws and regulations.  Docket No. 25 at 8-17.  The Court will analyze each argument in turn.

### 1.  Whether S.B. 71 Regulates Price or Delivery

AstraZeneca argues that S.B. 71 regulates drug pricing, not delivery.  *Id.* at 8.  It is not entirely clear to the Court why that matters to the preemption analysis.

---

[3] While AstraZeneca does not make a field preemption argument against S.B. 71, one court in this district has already ruled that Congress did not intend to preempt the field when enacting Section 340B.  *Weiser*, 2025 WL 3041825, at *6-8.

Apparently, AstraZeneca's argument is that, if S.B. 71 and Section 340B both regulate price, they necessarily conflict such that S.B. 71 is preempted. However, AstraZeneca fails to explain what conflict would ensue if S.B. 71 and Section 340B both regulate price. *See id.* at 8-11. The Court does not find that any such conflict exists. Section 340B sets discounted drug prices for eligible patients. S.B. 71 mandates that those Section 340B-discounted drugs must be distributed to unlimited contract pharmacies. The Court fails to see how those two requirements conflict with one another; if anything, they seem to complement each other. The federal government, acting through HHS, attempted to enact the same requirement as S.B. 71 through its 2020 guidance. *Johnson*, 102 F.4th at 459. The Third Circuit and D.C. Circuit, however, held that Section 340B is silent about delivery and therefore does not contain such a requirement. *Johnson*, 102 F.4th at 464; *Sanofi Aventis*, 58 F.4th at 707. Colorado and other states attempted to fill the gap through state legislation that mirrors the earlier guidance of HHS. Such legislation does not create a conflict, regardless of whether S.B. 71 is considered to regulate price or to regulate delivery.

In any event, the Court finds that S.B. 71 does not regulate price. Other courts agree. *Weiser*, 2025 WL 3041825, at *11 ("the Court . . . concludes that AbbVie has not demonstrated a substantial likelihood of success on the merits of its preemption claim based on its assertion that, like Section 340B, [S.B. 71] purports to regulate pricing."); *Fitch*, 152 F.4th at 647 (stating that a law substantially similar to S.B. 71 regulates the distribution of drugs, not the pricing of those drugs); *McClain*, 95 F.4th at 1145 (same).

AstraZeneca's arguments to the contrary are unpersuasive. AstraZeneca notes that S.B. 71 identifies the drugs it regulates in terms of their price. For example, S.B. 71

15

states that manufacturers "shall not . . . prohibit . . . the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or a location otherwise authorized by a 340B covered entity to receive and dispense 340B drugs."  Colo. Rev. Stat. § 6-29-105(1)(a).  A 340B drug is defined as any drug discounted under the Section 340B program that has been purchased by a covered entity.  Colo. Rev. Stat. § 6-29-103(2).  In AstraZeneca's view, the fact that these drugs are identified by their price is enough to make S.B. 71 a regulation of price. But S.B. 71 is clear that it is Section 340B that sets the price of the discounted drugs; S.B. 71 merely dictates that those drugs must be made available at more locations, namely, at unlimited contract pharmacies.

AstraZeneca further argues that the "replenishment model" is indicative that S.B. 71 regulates price.  Docket No. 25 at 10-11.  Under the replenishment model, discounted and non-discounted drugs are intermingled on the shelves of the pharmacy, and it is not determined by the pharmacy which drugs are discounted under Section 340B until they are already dispensed.  *Johnson*, 102 F.4th at 457-58.  As a result, AstraZeneca asserts that, "'[b]ecause the drug is already in the hands of the contract pharmacy before the patient arrives at the pharmacy, the question is not about delivery of the drug.'"  Docket No. 25 at 11 (quoting *Morrisey*, 760 F. Supp. 3d at 455).  However, "[r]eplenishment inventory systems are commonplace [and] . . . pharmaceuticals distribution often relies on pharmaceuticals' fungibility to facilitate efficiency."  *Fitch*, 2024 WL 3503965, at *14 (citation omitted).  Thus, the Court agrees that the replenishment model is a means of efficient distribution, and AstraZeneca's argument reflects a

16

"technicality," which does not suddenly make S.B. 71 a regulation of price.  *See id.* at \*15 (stating that the replenishment model facilitates efficient distribution of Section 340B drugs and that reality cannot "be undercut by technicality").  Accordingly, S.B. 71 does not regulate price and, even if it did, that would not necessarily mean it is preempted by Section 340B.

### 2.  *Recalibration of the Burdens and Benefits*

AstraZeneca argues that S.B. 71 is an obstacle to the purposes and objectives of Congress because it recalibrates the benefits and burdens of participation in Section 340B.  Docket No. 25 at 11.  According to AstraZeneca, Congress "carefully balanced the benefits and burdens of participation in the 340B program," and S.B. 71 upsets that balance.  *Id.*  However, AstraZeneca provides no evidence that Congress considered whether drug manufacturers would participate in Section 340B if the program was too expensive.

Conversely, there is evidence that Section 340B was enacted so healthcare providers could "'reach[ ] more eligible patients and provid[e] more comprehensive services.'"  340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89 FR 28643-01 ("ADR Rule"), at 28,643 (April 19, 2024) (quoting H.R. Rep. No. 102-384(II), at 12 (1992)); *see also Sanofi Aventis*, 58 F.4th at 699 (stating that Section 340B helps providers care for low-income and rural persons).  S.B. 71 helps accomplish this purpose by making Section 340B drugs more accessible to more patients.  Thus, as noted by the Eighth Circuit when analyzing a similar Arkansas law, the state statute "does not create an obstacle for pharmaceutical manufacturers to comply with 340B, rather it does the opposite: [the statute] assists in fulfilling the purpose of 340B."  *McClain*, 95 F.4th at 1144-45.  AstraZeneca does not directly support its argument to

17

the contrary.  Instead, AstraZeneca argues that S.B. 71 interferes with federal objectives "because it specifically targets federal law—applying *only* to 340B participants, *only* to 340B drugs, and *only* to pharmacies that contract with 340B-covered entities.  Docket No. 25 at 12.  "The Supreme Court, however, has never adopted a categorical rule that requires a finding of preemption whenever a state law is addressed directly to those participating in a federal program where the federal statute does not rely on the state to implement the program."  *Frey*, 2025 WL 2813787, at *10.  S.B. 71 does not interfere with Section 340B's objectives, but instead helps to achieve them.  Thus, there is no preemption issue raised by S.B. 71 attaching itself to Section 340B.

AstraZeneca also claims that, if Colorado is allowed to add to the burdens of participating in Section 340B, then so may other states.  Docket No. 25 at 13.  It argues that such laws run the risk of conflicting adjudications which would "frustrate[ ] Congress's goal of a national, uniform 340B program."  *Id.*  However, AstraZeneca does not provide evidence that Congress intended the Section 340B program to be nationally uniform and, in any event, states are increasingly passing laws that are substantially similar to S.B. 71.  Thus, laws like S.B. 71 are becoming the norm rather than the exception.  While AstraZeneca asserts that all of these laws are slightly different, it does not explain what those differences are or how they create an obstacle to the purposes and objectives of Congress.[4]

---

[4] AstraZeneca argues that the differences between S.B. 71 and similar laws could frustrate Section 340B's enforcement scheme.  Docket No. 25 at 13.  The Court will address the enforcement scheme in the next subsection.

18

### 3. Enforcement Schemes

AstraZeneca notes that Section 340B contains a federal enforcement regime. Docket No. 25 at 13-14. In *Astra*, the Supreme Court observed that, in certain circumstances, private entities bringing suit under Section 340B would interfere with the administration and enforcement of the program. 563 U.S. at 120. AstraZeneca points out that S.B. 71 authorizes the Colorado Attorney General and district attorneys to bring civil actions to enjoin violations and recover penalties. Docket No. 25 at 14. Thus, relying on *Astra*, AstraZeneca argues that S.B. 71's state enforcement scheme encroaches on the federal government's Section 340B enforcement scheme. *Id.* However, S.B. 71 does not create new enforcement authority over Section 340B; rather, it creates enforcement authority for violations of S.B. 71 itself. *See* Colo. Rev. Stat. § 6-29-105(3)(a) ("The attorney general may investigate a complaint concerning a violation of *this article 29*. A person that violates *this article 29* . . . is subject to the enforcement provisions, civil penalties, and damages set forth in article 1 of this title 6.") (emphasis added). Thus, S.B. 71's enforcement scheme does not impact enforcement of Section 340B, and there is no conflict between the two. *See Weiser*, 2025 WL 3041825, at *9 (finding that S.B. 71 only penalizes activity that falls outside the purview of Section 340B). Other courts have come to the same conclusion about state law enforcement schemes like the one found in S.B. 71. *See id.* (collecting cases).

AstraZeneca argues that the federal and state enforcement schemes conflict because S.B. 71 would require state adjudicators to "consider and resolve questions of federal law in order to determine whether a manufacturer has violated the statute." Docket No. 25 at 14. However, "state courts are regularly and rightly called on to decide questions of federal law, as they have throughout our history." *In re C & M*

19

*Props., L.L.C.*, 563 F.3d 1156, 1167 (10th Cir. 2009).  Accordingly, AstraZeneca has not shown a likelihood of success on the merits based on its claim that S.B. 71's enforcement scheme is preempted by Section 340B.

### 4.  *Claims-Data Restriction*

AstraZeneca's final argument that S.B. 71 is preempted by Section 340B is based on Colo. Rev. Stat. § 6-29-105(1)(b).  Docket No. 25 at 16.  This provision prohibits manufacturers from requiring covered entities or contract pharmacies to submit any "health information, claims or utilization data, purchasing data, payment data, or other data that does not relate to a claim submitted to a federal health care program, unless such data is voluntarily furnished by such covered entity or otherwise required to be furnished under applicable federal law."  Colo. Rev. Stat. § 6-29-105(1)(b). AstraZeneca argues that this restriction conflicts with federal law in three ways.  Docket No. 25 at 14-16.

First, Astra Zeneca notes that manufacturers must audit covered entities or contract pharmacies prior to manufacturers filing an alternative dispute resolution ("ADR") claim.  *Id.* at 14-15 (citing ADR Rule at 28,644).  However, before auditing, manufacturers need documentation from the covered entity or pharmacy that indicates that there is reasonable cause to support a request for an audit.  Manufacturer Audit Guidelines and Dispute Resolution Process 0905-ZA-19, 61 FR 65406-01 ("Audit Guidelines"), at 65409 (Dec. 12, 1996).  Because S.B. 71 restricts manufacturers' ability to get this documentation, AstraZeneca argues that it is preempted.  Docket No. 25 at 14-16.  Courts addressing this argument, however, have found that manufacturers have not demonstrated that the "reasonable cause" standard is particularly burdensome, or that manufacturers cannot find reasonable cause to perform an audit without requiring

20

claims-data from covered entities or contract pharmacies.  *See Skrmetti*, 2025 WL 1805271, at *15-16; *Frey*, 2025 WL 2813787, at *12.  As one court observed, "if a manufacturer has an articulable basis for suspecting that a covered entity is engaging in prohibited conduct, it likely will have reasonable cause to request an audit."  *Skrmetti*, 2025 WL 1805271, at *16.  Therefore, AstraZeneca has not shown a likelihood of success on its argument that S.B. 71's claim-data restriction prevents manufacturers from conducting the audits needed for filing ADR claims.

Second, AstraZeneca asserts that, under the Drug Price Negotiation Program, 42 U.S.C. §§ 1320f *et seq.*, manufacturers have a duty to prevent duplicate price reductions by identifying when a drug is dispensed as a Section 340B drug.  Docket No. 25 at 15 (citing CMS, Medicare Drug Price Negotiation Program: Final Guidance, at 58-60 (Oct. 2, 2024), http://bit.ly/3Y719J0).  Therefore, AstraZeneca argues that S.B. 71 "bars manufacturers from obtaining the data they need to conduct this federally required de-duplication."  *Id.*  This argument lacks merit because S.B. 71's claim-data restriction does not apply if the data is required to be furnished under applicable federal law.  Colo. Rev. Stat. § 6-29-105(1)(b).

Finally, AstraZeneca argues that the claims-data restriction prevents manufacturers from participating in a federal pilot program under which manufacturers may receive sales data from covered entities before paying Section 340B rebates. Docket No. 25 at 15-16.  Judge Martinez held that there is no conflict, because Colo. Rev. Stat. § 6-29-105(5) allows data to be collected if it is required to be furnished under federal law.  *Weiser*, 2025 WL 3041825, at *12.  AstraZeneca, however, argues that this exception would not apply to the pilot program because participation is voluntary, not

required.  Docket No. 57 at 11 n.2.  Even if true, AstraZeneca has not shown that

manufacturers could not participate in the pilot program, since S.B. 71 does not prohibit

them from requesting covered entities to provide data.  The language of the pilot

program discusses the type of data that manufacturers can "request."  340B Program

Notice: Application Process for the 340B Rebate Model Pilot Program; Correction, 90

FR 38165-01, at 38,167 (Aug. 7, 2025).  Accordingly, none of these three arguments

show a likelihood of success on the claim that S.B. 71's claim-data restriction provision

is preempted.

### F.  Whether S.B. 71 is Preempted by Federal Patent Laws

AstraZeneca's final argument is that S.B. 71 is preempted by federal patent laws.

Docket No. 25 at 17-18.  In support of this argument, AstraZeneca notes that patent

laws incentivize inventors by carefully balancing their rewards and incentives with the

public interest.  *Id.* at 17 (citing *Biotech Indus. Org. v. District of Columbia* ("*BIO*"), 496

F.3d 1362, 1373 (Fed. Cir. 2007)).  AstraZeneca argues that laws capping the price of

patented drugs skews that balance and are "'contrary to the goals established by

Congress in the patent laws.'"[5]  *Id.* (citing *BIO*, 496 F.3d at 1374).  This argument fails

because S.B. 71 does not cap the price of patented drugs—Section 340B does.

Moreover, the case AstraZeneca cites in support of this argument—*BIO*—is

inapposite for other reasons as well.  In *BIO*, the disputed law operated exclusively

within the scope of patent laws and applied only to patented drugs.  496 F.3d at 1374-

75.  Conversely, S.B. 71 does not operate only within the scope of patent laws.  Rather,

---

[5] Five district courts have already rejected this argument as it relates to state laws similar to S.B. 71.  *See Fitch*, 677 F. Supp. 3d at 664-65; *Bailey*, 2025 WL 644285, at *2-3; *Novartis Pharms. Corp. v. Bailey*, 2025 WL 489881, at *2-3 (W.D. Mo. Feb. 13, 2025); *Murrill*, 2024 WL 4361597, at *9; *Fitch*, 738 F. Supp. 3d at 753.

it applies to patented and unpatented drugs alike.  While *BIO* did set limits on a state's

ability to cap the price of patented drugs, "Congress never intended that the patent laws

should displace the police powers of the States."  *Webber v. State of Virginia*, 103 U.S.

344, 347-48 (1880).  Here, a law that neither caps the price of a patented drug nor

specifically targets patented drugs cannot justifiably be found preempted under *BIO*.

This is particularly true because such a finding would inhibit Colorado's ability to protect

public health, an area long recognized as a traditional police power.  *Medtronic*, 518

U.S. at 475.  Accordingly, AstraZeneca has not shown a likelihood of success on the

merits as to its claim that S.B. 71 is preempted by federal patent laws.[6]

## IV.  CONCLUSION

Therefore, it is

**ORDERED** that Plaintiff's Motion for a Preliminary Injunction [Docket No. 25] is

**DENIED**.

DATED December 17, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

---

[6] Because AstraZeneca has not shown a likelihood of success on the merits as to any of its claims, the Court will not address the other preliminary injunction factors. *See Dominion Video Satellite*, 356 F.3d at 1266 n.8 (refusing to address other preliminary injunction factors after finding that one factor was not met).