# No. 25-1619

# United States Court of Appeals for the Eighth Circuit

NOVARTIS PHARMACEUTICALS CORPORATION,

Plaintiff-Appellant,

v.

CATHERINE L. HANAWAY, in her official capacity as Attorney General of the State of Missouri; JAMES L. GRAY, in his official capacity as President of the Missouri Board of Pharmacy; CHRISTIAN S. TADRUS, in his official capacity as Vice President of the Missouri Board of Pharmacy; DOUGLAS R. LANG, in his official capacity as a member of the Missouri Board of Pharmacy; COLBY GROVE, in his official capacity as a member of the Missouri Board of Pharmacy; ANITA K. PARRAN, in her official capacity as a member of the Missouri Board of Pharmacy; TAMMY THOMPSON, in her official capacity as a member of the Missouri Board of Pharmacy; and DARREN HARRIS, in his official capacity as a member of the Missouri Board of Pharmacy,

Defendants-Appellees,

*—and—*

MISSOURI HOSPITAL ASSOCIATION and MISSOURI PRIMARY CARE ASSOCIATION,

Intervenors-Appellees.

On Appeal from the United States District Court for the Western District of Missouri
2:24-cv-04131-MDH
The Honorable M. Douglas Harpool

## PLAINTIFF-APPELLANT NOVARTIS PHARMACEUTICALS CORPORATION'S PETITION FOR REHEARING EN BANC

JESSICA L. ELLSWORTH
SUSAN M. COOK
MATTHEW J. HIGGINS
SAM H. ZWINGLI
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hlc.com

July 15, 2026                    *Counsel for Plaintiff-Appellant*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION AND RULE 40(B) STATEMENT ..............................................1

ISSUES MERITING EN BANC CONSIDERATION...............................................4

STATEMENT OF THE CASE......................................................................4

ARGUMENT ......................................................................................10

    I.     THE PANEL'S DORMANT COMMERCE CLAUSE
          RULING CONFLICTS WITH THIS COURT'S DECISION
          IN *ELLISON* ................................................................10

    II.    THE PANEL'S PREEMPTION RULING RELIES ON
          *MCCLAIN*, WHICH WAS WRONGLY DECIDED .........................12

    III.   THESE ISSUES RAISE QUESTIONS OF
          EXCEPTIONAL IMPORTANCE ......................................................17

CONCLUSION .....................................................................................18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*AbbVie Inc. v. Drummond*,
808 F. Supp. 3d 1266 (W.D. Okla. 2025)........................................7, 8, 15, 17

*AbbVie Inc. v. Wrigley*,
__ F. Supp. 3d __, 2026 WL 1133457
(D.N.D. Apr. 27, 2026).................................................4, 9, 10, 12, 17

*Arizona v. United States*,
567 U.S. 387 (2012)..............................................................14, 15

*Association for Accessible Medicines v. Ellison*,
140 F.4th 957 (8th Cir. 2025) .....................................1, 4, 9, 11, 12

*Association for Accessible Medicines v. Frosh*,
887 F.3d 664 (4th Cir. 2018) .........................................................11

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011)............................................................5, 14, 15

*Landor v. Louisiana Dep't of Corrections & Pub. Safety*,
609 U.S. __, 2026 WL 1791277 (June 23, 2026)..........................16

*National Pork Producers Council v. Ross*,
598 U.S. 356 (2023).....................................................................1

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024)............................... 3, 5-7, 14, 16

*Pharmaceutical Rsch. & Mfrs. of Am. v. McClain*,
95 F.4th 1136 (8th Cir. 2024) ................................................1, 14

*Pharmaceutical Rsch. & Mfrs. of Am. v. McCuskey*,
171 F.4th 675 (4th Cir. 2026) .....................................13, 14, 16, 17

*Sanofi Aventis v. HHS*,
58 F.4th 696 (3d Cir. 2023) ...............................3, 5, 7, 14, 16, 17

Page(s)

**STATUTES:**

42 U.S.C. § 256b(a)(1)-(2) ...................................................................5

42 U.S.C. § 256b(a)(5)(A) ....................................................................5

42 U.S.C. § 256b(a)(5)(B) ....................................................................5

42 U.S.C. § 256b(d)(1)(A) ..................................................................13

42 U.S.C. § 256b(d)(2)(B)(iv) ............................................................14

42 U.S.C. § 1396r-8(a)(1) .....................................................................5

42 U.S.C. § 1396r-8(a)(5)(A) ...............................................................5

Minn. Stat. § 62J.96 ..............................................................................3

Mo. Rev. Stat. § 376.414.1(1)(b) .........................................................8

Mo. Rev. Stat. § 376.414.2 ...................................................................7

Mo. Rev. Stat. § 376.414.3 ...................................................................8

Mo. Rev. Stat. § 407.095 ......................................................................8

Mo. Rev. Stat. § 407.110 ......................................................................8

Mo. Rev. Stat. § 407.130 ......................................................................8

Mo. S.B. 751 (2024).....................................................................*passim*

N.D. Cent. Code § 43-15.3-08 .............................................................3

Neb. L.B. 168, § 3(1) (2025) ................................................................3

S.D. S.B. 154 (2025) .............................................................................3

**RULES:**

Fed. R. App. P. 40(b)(2)(A)..................................................................1

Page(s)

Fed. R. App. P. 40(b)(2)(B) ...............................................................3

Fed. R. App. P. 40(b)(2)(D) ...............................................................3

**REGULATION:**

42 C.F.R. § 10.21 ...............................................................................15

**LEGISLATIVE MATERIAL:**

H.R. Rep. No. 102-384, pt. 2 (1992) ..................................................4

**OTHER AUTHORITIES:**

HRSA, 340B ADR Decision Summaries, ADR ID: 211115-11 & ADR
    ID: 230925-17 (updated May 6, 2026),
    https://tinyurl.com/mzbt2bbe.......................................................7

National Ass'n of Cmty. Health Ctrs., State-Level 340B Laws and
    Legislation Tracker (Apr. 23, 2026),
    https://www.nachc.org/resource/state-level-340b-laws-and-
    legislation-tracker/ ....................................................................17

**INTRODUCTION AND RULE 40(B) STATEMENT**

Last year, in *Association for Accessible Medicines v. Ellison*, a panel of this Court held that a Minnesota law with the "specific extraterritorial effect of controlling the price of wholly out-of-state transactions" between drug manufacturers and wholesalers violated the dormant Commerce Clause. 140 F.4th 957, 961 (8th Cir. 2025) (interpreting *National Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023)). Without distinguishing, discussing, or acknowledging *Ellison*, the panel here held the exact opposite: that a Missouri law with a specific extraterritorial effect of controlling the price of wholly out-of-state transactions between drug manufacturers and wholesalers does ***not*** violate the dormant Commerce Clause. Op. 11-13. By ignoring *Ellison*'s squarely on-point holding that state law cannot constitutionally "insist[] that out-of-state [drug] manufacturers sell their drugs to wholesalers for a certain price," the panel created an intra-circuit split. This split is direct and unmistakable, and it warrants en banc review. Fed. R. App. P. 40(b)(2)(A).

In addition, two years ago, in *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024), a panel of this Court held that an Arkansas law imposing additional obligations specifically—and only—on drug manufacturers who choose to participate in a federal drug-pricing program was not preempted. The panel reasoned that the "practice of pharmacy" is a traditional area of state regulation, *id.*

1

at 1143, even though Arkansas's law does not regulate pharmacies at all; it regulates manufacturers who participate in the federal program by mandating they offer to sell additional discount-priced units of drugs to certain categories of healthcare providers. And *McClain* viewed Arkansas's law as regulating "delivery" divorced from "price" even though the law forces manufacturers to give discounted pricing on additional transactions that would have occurred anyway at the commercial price. *Id.* at 1144-45.

After other states followed Arkansas's lead in enacting similar statutes, the United States began filing amicus briefs explaining that *McClain* was wrongly decided. As the United States has emphasized, a state law that parasitically targets only manufacturers who participate in a federal drug-pricing program—and imposes additional obligations because of their participation—upsets the terms that Congress set for that uniquely federal program and runs afoul of the Supremacy Clause. *See, e.g.*, U.S. Amicus Br., ECF 178-1, *PhRMA v. McCuskey*, No. 25-1054(L) (4th Cir. July 10, 2026) (concerning West Virginia law); U.S. Amicus Br., *PhRMA v. Frey*, No. 26-1099 (1st Cir. Mar. 9, 2026) (concerning similar Maine law). Such state laws also interfere with the federal government's exclusive, uniform, and nationwide enforcement authority. *Id.*

Here, a panel largely overlapping with the *McClain* panel held that *McClain* controlled Novartis's preemption challenge. Novartis specifically preserved en banc

review of *McClain*. Opening Br. 8, 52-55. This is a constitutional question of exceptional importance given the number of states within this Circuit that have enacted similar laws. *See* Fed. R. App. P. 40(b)(2)(B), (D); Minnesota (Minn. Stat. § 62J.96); Nebraska (Neb. L.B. 168, § 3(1) (2025)); North Dakota (N.D. Cent. Code § 43-15.3-08); South Dakota (S.B. 154 (2025)).

At the center of this case is a federal drug-pricing program known as the 340B Program. Congress designed the program under its Spending Clause authority to require drug manufacturers who wish to participate in Medicaid and Medicare Part B to offer to sell their drugs at deeply discounted prices to specific categories of healthcare providers known as "covered entities." Although two courts of appeals have held that Congress intentionally preserved participating manufacturers' right to impose commercially reasonable limitations on those 340B-priced offers, *see Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 462 (D.C. Cir. 2024), *Sanofi Aventis v. HHS*, 58 F.4th 696, 704 (3d Cir. 2023), several states have decided to enact laws that eliminate manufacturers' right to do so. Missouri's S.B. 751 is one such law. It imposes additional state-law requirements on 340B-participating manufacturers precluding them from imposing commercially reasonable limitations on discounted-sale offers that Congress preserved for them if they agreed to participate in this federal program.

Rehearing en banc is warranted on both Novartis's dormant Commerce Clause challenge and its preemption challenge. Indeed, Judge Traynor's decision in *AbbVie Inc. v. Wrigley* persuasively explains why a similar North Dakota law is unconstitutional because it "violates the Supremacy Clause and the Commerce Clause." __ F. Supp. 3d __, 2026 WL 1133457, at *15 (D.N.D. Apr. 27, 2026), *appeal docketed*, No. 26-1860 (8th Cir. May 5, 2026). This Court should grant en banc review to resolve the intra-circuit split over the dormant Commerce Clause's application to state laws that regulate out-of-state transactions between drug manufacturers and wholesalers and to correct legal errors in *McClain* that the panel held controlled the preemption question here.

### ISSUES MERITING EN BANC CONSIDERATION

1.      Whether a state law that has the extraterritorial effect of controlling the price of wholly out-of-state transactions violates the dormant Commerce Clause, as this Court already held in *Ellison*, 140 F.4th at 961.

2.      Whether the Supremacy Clause prohibits states from altering the conditions for participating in the federal 340B Program and from interfering with the federal government's exclusive authority over this Program.

### STATEMENT OF THE CASE

1. Congress created the 340B Program in 1992. H.R. Rep. No. 102-384, pt. 2, at *12 (1992). As a condition of having their drugs covered by Medicaid and

Medicare Part B, drug manufacturers must offer to sell their products to certain healthcare providers (called "covered entities") at steeply discounted prices set by a federal statutory formula. 42 U.S.C. § 256b(a)(1)-(2); *id.* §§ 1396r-8(a)(1), (a)(5)(A). Covered entities then re-sell those 340B-discounted units of drugs to patients and their insurance plans at full price and keep the spread between that price and the 340B price. The 340B Program thus operates as a subsidy for covered entities; it is not a patient discount program. Congress vested HHS with exclusive oversight authority for the 340B Program and directed HHS to "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 120 (2011).

2. Congress did not intend for the program to be unlimited or view 340B discounts as an open checkbook for covered entities. The 340B Statute prohibits covered entities from reselling or otherwise transferring a 340B-priced unit of drug to "a person who is not a patient of the entity," and prohibits "duplicate discounts," where manufacturers both pay a Medicaid rebate and provide a 340B discount on the same unit of drug. 42 U.S.C. § 256b(a)(5)(A), (B). Congress also preserved manufacturers' ability to impose reasonable conditions on their offer of the 340B price to covered entities. *Novartis*, 102 F.4th at 462; *Sanofi*, 58 F.4th at 704-706.

The amount by which covered entities profit from the 340B Program turns on how many units of drugs they buy at the 340B price and sell at a higher price.

*Novartis*, 102 F.4th at 455. This is a matter of simple math: more discounted units equals more profit, because their profit flows from the spread between the 340B price and the commercial reimbursement rate. Covered entities are not required to, and rarely do, pass 340B-discounted prices on to patients, leaving the "340B program vulnerable to abuse—at great cost to the manufacturers." *Id.*

In recent years, covered entities have contracted with dozens and sometimes hundreds of third-party pharmacies ("contract pharmacies") to expand the number of 340B-priced units of drug on which they can claim 340B discounts, thus expanding the profits from the 340B Program. These arrangements do not change how many units of a drug are dispensed in a state; they change only the acquisition price paid to the wholesaler for certain units of that drug. By using multiple contract pharmacies—instead of a single in-house or contract pharmacy—a covered entity can sharply increase the number of drug units that it buys at the 340B-discounted price and thereby correspondingly increase its profits from the Program. To make this work, contract pharmacies hire third-party administrators to sift through pharmacy data looking for purported matches between pharmacy customers and covered-entity patients. When a purported match is found, the covered entity orders a new 340B-priced unit of the drug from the wholesaler to replace the already-dispensed pharmacy unit, and the wholesaler, in turn, requests a refund from the manufacturer for that unit.

Concerned that contract-pharmacy arrangements drive abuse, Novartis and other manufacturers instituted some limitations on their offers to sell drugs at 340B prices to covered entities. Relevant here, Novartis's offer limits covered entities to a single contract pharmacy, which federal law permits. *Novartis*, 102 F.4th at 462; *Sanofi*, 58 F.4th at 704-706. That is because Congress intentionally preserved manufacturers' right to impose commercially reasonable limitations on offers to sell drugs at the 340B-discounted price. *Novartis*, 102 F.4th at 462; *Sanofi*, 58 F.4th at 704-706. HHS has denied covered entities' administrative claims challenging Novartis's one-contract-pharmacy policy. *See, e.g.*, HRSA, 340B ADR Decision Summaries, ADR ID: 211115-11 & ADR ID: 230925-17 (updated May 6, 2026), https://tinyurl.com/mzbt2bbe (finding "no overcharge violation").

3. In 2024, Missouri enacted S.B. 751 to add state-law requirements to Novartis's participation in the federal 340B Program, even though this is not a cooperative federalism program and Congress assigned states no role in it. S.B. 751 makes it illegal for "pharmaceutical manufacturer[s]" to "deny, restrict, or prohibit, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to" a pharmacy under contract with a "covered entity" as that term is defined in that 340B statute. S.B. 751, Mo. Rev. Stat. § 376.414.2. Missouri's law seeks to accomplish what "federal courts had said HHS could not lawfully do," *AbbVie Inc. v. Drummond*, 808 F. Supp. 3d 1266, 1273 (W.D. Okla. 2025): prohibit

7

manufacturers from having a commercially reasonable one-contract-pharmacy limitation on their offer to sell 340B-priced drugs to covered entities.

The Missouri Attorney General enforces S.B. 751 violations and is empowered to seek significant civil and criminal penalties. Mo. Rev. Stat. §§ 376.414.3, 407.095, 407.110, 407.130.

4. S.B. 751 regulates drug pricing, not merely drug delivery, because in all cases the statute's obligations apply to a "340B drug," a term Missouri defines by reference to its reduced price under the 340B Program. S.B. 751, Mo. Rev. Stat. § 376.414.1(1)(b); Opening Br. 28-33. Because the "drug is the same whether sold under the 340B Program or otherwise," Missouri's definition of a "340B drug" recognizes that "the only difference between a '340B drug' and a non-340B drug is … [its] price." *Drummond*, 808 F. Supp. 3d at 1276. Indeed, wholesalers already delivered the same drugs to the same pharmacies before the law passed—just at the commercial price. App.19 (R._Doc._1, at 19 ¶ 60). S.B. 751 mandates that Novartis offer the lower 340B price for additional units of these drugs. App.10, 18-19 (R._Doc._1, at 10, 18-19 ¶¶ 33, 57-60).

Missouri's law sets the price for *out-of-state* transactions. Novartis, headquartered outside Missouri, typically sells its drugs to national wholesalers and distributors also located outside Missouri. App.28-29 (R._Doc._1, at 28-29 ¶ 96). The wholesalers and distributors then sell the drugs to pharmacies—often national

pharmacy chains typically outside Missouri. *Id.* Further down the distribution chain, the drugs cross the Missouri line and are dispensed to patients from an in-state pharmacy. *Id.*

To claim the 340B-discounted price, a covered entity does not request or receive the discount directly from Novartis, but from the (largely out-of-state) wholesalers and distributors. *Id.* The national wholesalers separately request a refund from the manufacturers so that the price paid by the wholesaler to Novartis for that unit of drug is the 340B price. S.B. 751 therefore sets the price of that out-of-state transaction. *Id.*; *Wrigley*, 2026 WL 1133457, at *23 (similar North Dakota 340B statute "regulates out-of-state manufacturers and out-of-state wholesalers").

5. Novartis challenged the constitutionality of S.B. 751 and sought a preliminary injunction. Novartis argued that S.B. 751 violates the dormant Commerce Clause because, among other things, it has the effect of exercising extraterritorial control over the price that out-of-state manufacturers charge out-of-state wholesalers and is preempted. The District Court denied Novartis's preliminary injunction motion. While Novartis's appeal was pending, this Court decided *Ellison*, 140 F.4th at 961. Novartis's opening brief referred to that then-pending appeal, and its reply brief explained that the decision was binding authority and dispositive on Novartis's dormant Commerce Clause challenge. Opening Br. 35-39; Reply Br. 12-16; *see generally* Oral Argument.

The panel affirmed. Ignoring the published *Ellison* decision from a panel consisting of Judges Colloton, Gruender, and Kobes, the panel here rejected Novartis's dormant Commerce Clause challenge. Op. 13. And it rejected Novartis's preemption challenges based on *McClain*. Op. 21.

## ARGUMENT

**I.     THE PANEL'S DORMANT COMMERCE CLAUSE RULING CONFLICTS WITH THIS COURT'S DECISION IN *ELLISON*.**

*Ellison* held that a Minnesota law prohibiting out-of-state manufacturers from setting certain prices on generic drugs sold, dispensed, or delivered to consumers within Minnesota violated the dormant Commerce Clause's prohibition on extraterritorial effects. 140 F.4th at 959-960. This Court detailed the drug-distribution network in which out-of-state manufacturers sell drugs to out-of-state wholesalers. Because Minnesota's law effectively regulated the price of those transactions, it had the "impermissible extraterritorial effect of controlling prices outside of Minnesota" in violation of the dormant Commerce Clause— notwithstanding that the drugs eventually crossed into Minnesota. *Id.* at 959-960.

*Ellison* resolves this case—or at least it should have. Like the law in *Ellison*, S.B. 751 regulates out-of-state transactions between manufacturers and wholesalers. Just as the Minnesota statute "insist[ed] that out-of-state manufacturers sell their drugs to wholesalers for a certain price," *Ellison*, 140 F.4th at 961, so too does S.B. 751. Reply Br. 11-14; *see also Wrigley,* 2026 WL 1133457, at *12 (holding similar

North Dakota law fails extraterritorial-effects test because it "directly regulates the amount and price of sales between out-of-state manufacturers and out-of-state wholesalers"); *Association for Accessible Medicines v. Frosh*, 887 F.3d 664, 671-674 (4th Cir. 2018) (same conclusion as *Ellison* on similar law). Again, Missouri's law requires manufacturers to give discounted pricing to wholesalers, so that wholesalers can provide discount-priced drugs to contract pharmacies—the same mandatory upstream and out-of-state discount that *Ellison* held violates the dormant Commerce Clause.

The panel ruling conflicts with *Ellison* at every turn. The panel emphasized that S.B. 751 "does not purport to regulate transactions between drug manufacturers and their wholesalers." Op. 12. But this is no different than the Minnesota law in *Ellison*, which also applied only to "manufacturers," not to wholesalers or distributors. *Ellison*, 140 F.4th at 959. Nor does it matter that S.B. 751 purports to "regulate[] only the delivery of 340B drugs to contract pharmacies" within Missouri. Op. 12. *Ellison* expressly rejected that *exact* reasoning. 140 F.4th at 960.

Moreover, the panel interprets the Supreme Court's *Pork Producers* decision to mean that a state law must "target out-of-state transactions between drug manufacturers and wholesalers" to become an impermissible extraterritorial effect. Op. 13.

11

But *Ellison* also interpreted *Pork Producers*—and its interpretation directly conflicts with the panel's. *Ellison* held that "discrimination" against out-of-state transactions is not required where a statute has "the specific extraterritorial effect of controlling the price of wholly out-of-state transactions." 140 F.4th at 961. What matters is the "effect" of extraterritorial price control. *Id.* at 960-961; *Wrigley*, 2026 WL 1133457, at \*12 (*Pork Producers* rejected the "almost per se rule against laws with extraterritorial effects," distinct from the enduring prohibition on extraterritorial price controls). As *Ellison* explained, statutes can have an impermissible extraterritorial effect without facially "target[ing]" out-of-state transactions. Op. 12-13. En banc review is needed to resolve the panel's divergence from *Ellison*.

## II. THE PANEL'S PREEMPTION RULING RELIES ON *MCCLAIN*, WHICH WAS WRONGLY DECIDED.

S.B. 751 targets and restricts the conduct of drug manufacturers if—and only if—they participate in the 340B Program, imposing special state-law duties solely on those manufacturers and forcing them to sell their drugs at 340B prices in circumstances when federal law does not require them to do so. If Congress dissolved the 340B Program today, Missouri's law would be rendered meaningless. The law's entire purpose is to change the terms that govern manufacturers' participation in the 340B Program, and to add state enforcement mechanisms. *McClain* rejected a preemption challenge to a similar law, and the panel here (with

two overlapping judges to *McClain*) found *McClain* controlling.  Op. 21-23.  Both decisions err in several ways, conflict with Supreme Court precedent, and present a question of exceptional importance.

A state law is field-preempted where the "federal interest [is] so dominant" or the "framework of regulation so pervasive" that the "federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation omitted).  That is the case here, where "Congress left no role for States in determining manufacturers' 340B obligations." U.S. Amicus Br., *McCuskey*, *supra*, at 13.  A state law is conflict preempted if it poses "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quotation omitted).  That is the case here, as S.B. 751 intrudes upon the terms of this uniquely federal program and imposes additional, conflicting obligations on only federal program participants.

*Field Preemption.*  Congress made clear its intent to exclusively occupy the field of manufacturers' obligations to provide 340B-discounted drugs.  Opening Br. 52-53; *PhRMA v. McCuskey*, 171 F.4th 675, 692 (4th Cir. 2026), *reh'g en banc granted* (June 2, 2026) ("Congress has ousted States from this field.").  Indeed, it is HHS's exclusive duty to provide for compliance improvements, 42 U.S.C. § 256b(d)(1)(A), by establishing "*a single, universal, and standardized identification system*" for purposes of "facilitating the ordering, purchasing, and

13

delivery of covered outpatient drugs[,]" including "the processing of chargebacks for such drugs," *id.* § 256b(d)(2)(B)(iv) (emphasis added).

Invoking *McClain*, the panel held that "Congressional silence on pharmacies in the context of 340B indicates that Congress did not intend to preempt the field." Op. 21 (quoting *McClain*, 95 F.4th at 1144). But congressional silence about whether manufacturers can impose limitations on their offers to sell 340B-discounted drugs "preserves—rather than abrogates—the ability of sellers to impose at least some delivery conditions." *Novartis*, 102 F.4th at 460. Like all Spending Clause programs, the program terms must be set out in advance, and Congress gave no notice that states could change the Program's rules. The federal statute reflects an intentional choice by Congress not to impose additional conditions on 340B participation. *Id.*; *Sanofi*, 58 F.4th at 704-706; *McCuskey*, 171 F.4th at 691-693. As the United States has explained: "In light of the reticulated scheme Congress created," statutory silence "does not suggest that Congress left States free to layer on regulation." U.S. Amicus Br., *McCuskey*, *supra*, at 23.

***Enforcement Preemption.*** Again invoking *McClain*, the ruling that "Section 340B's enforcement mechanism" lacked preemptive force, Op. 21, runs headlong into the Supreme Court's decision in *Astra*, 563 U.S. at 120; *see* Opening Br. 53-55.

There, the Supreme Court held that Congress intentionally "centraliz[ed] enforcement in the [federal] government"; after all, "an adjudication of rights under"

14

the 340B Program could have "implications for" Medicaid and Medicare Part B. *Astra*, 563 U.S. at 119-120. 340B's "unitary administrative and enforcement" scheme, *id.* at 120, includes HHS resolving claims that "a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs" at the 340B price—the very type of claim S.B. 751 purports to assign to Missouri. *See* 42 C.F.R. § 10.21(a)(1).

Ignoring these principles, the panel said, "Congress vested HHS with only limited enforcement authority." Op. 21. That view cannot be squared with *Astra*'s holding, that Congress has not granted states—or anyone else—an "auxiliary enforcement role." *Astra*, 563 U.S. at 117; *see also* U.S. Amicus Br., *McCuskey*, *supra*, at 16 ("The Act supplants that scheme by arrogating to the State enforcement authority that properly belongs to the federal government alone."). Congress "vested authority to oversee compliance with the 340B Program in HHS" alone. *Astra*, 563 U.S. at 117. Statutes like S.B. 751 are "materially the same as the unconstitutional third-party enforcement scheme that the Supreme Court dispatched with in *Astra*." *Drummond*, 808 F. Supp. 3d at 1277.

Judges Richardson and Rushing illustrated the problem in their *McCuskey* decision. To impose state-law penalties, Missouri would first need to determine that a transaction was subject to 340B pricing. "But answering that question is central to HHS enforcement, and states providing their own answers necessarily intrudes

upon the uniform system of enforcement." *McCuskey*, 171 F.4th at 694; *id.* at 693 (*Astra* holds that "Congress made HHS the 340B program's sole enforcer"). The panel's approach conflicts with *Astra*, and en banc review is warranted.

***Conflict Preemption.*** Congress designed the 340B Program to preserve manufacturers' right to impose commercially reasonable limits on offers to sell 340B-priced drugs. *Novartis*, 102 F.4th at 463; *Sanofi*, 58 F.4th at 706 ("Congress's purposes" were not for covered entities to "use an unlimited number of contract pharmacies"). S.B. 751 conflicts with that congressional decision because it alters the 340B Program's bargain by forcing manufacturers to offer 340B-priced drugs on different sale terms to Missouri covered entities than federal law permits. Opening Br. 48-50. But Spending Clause bargains may not be changed without participants' "knowing and voluntary consent." *Landor v. Louisiana Dep't of Corrections & Pub. Safety*, 609 U.S. __, 2026 WL 1791277, at *7 (June 23, 2026).

The panel held S.B. 751 is not conflict preempted because the federal statute only relates to pricing, while Missouri's law relates to delivery. Op. 22-23. But if S.B. 751 were not about the price of the unit of drug being delivered to a pharmacy, the financial incentive for contract-pharmacy arrangements would disappear.

Anyway, S.B. 751 conflicts with the 340B Program even if viewed as concerning delivery separate from price. "Congress struck a careful bargain" with the 340B Program rather than enact a "floor" to which states may "add additional

16

obligations" as they see fit. *McCuskey*, 171 F.4th at 692; *accord Drummond*, 808 F. Supp. 3d at 1277; *Wrigley*, 2026 WL 1133457, at *11. Regardless of the label, what matters is that "Congress *did not* require manufacturers to distribute drugs to an unlimited number of contract pharmacies as part of the 340B program." *McCuskey*, 171 F.4th at 693 (citing *Sanofi*, 58 F.4th at 703-704). Missouri's law "compel[s] the very result HHS could not mandate," *id.*, and is preempted, *Drummond*, 808 F. Supp. 3d at 1277 (state laws requiring unlimited contract pharmacies are "contrary to federal law" and "must yield").

## III. THESE ISSUES RAISE QUESTIONS OF EXCEPTIONAL IMPORTANCE.

The panel opinion has enormous consequences, as the Fourth Circuit's grant of en banc review underscores. 176 F.4th 830 (4th Cir. June 2, 2026). Manufacturers participating in the 340B Program did not agree to be bound by up to fifty separate sets of 340B requirements and enforcers. *See* National Ass'n of Cmty. Health Ctrs., State-Level 340B Laws and Legislation Tracker (Apr. 23, 2026), https://www.nachc.org/resource/state-level-340b-laws-and-legislation-tracker/; Opening Br. 44. Complying with S.B. 751 costs Novartis millions of dollars annually in lost revenues. App.92 (R._Doc._9-1, at 4 ¶ 12). Aggregated across 22 states (and counting), this dramatically increases the cost of manufacturer participation in the 340B Program. And because the 340B Program is tied to manufacturer participation in Medicaid and Medicare Part B, state 340B laws risk

the integrity of all three programs—an area in which the federal interest "could hardly be stronger." U.S. Amicus Br., *McCuskey*, *supra*, at 27. It falls to Congress alone to weigh these risks.

## CONCLUSION

This Court should grant rehearing en banc.

Respectfully submitted,

/s/ Jessica L. Ellsworth
JESSICA L. ELLSWORTH
SUSAN M. COOK
MATTHEW J. HIGGINS
SAM H. ZWINGLI
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
July 15, 2026          jessica.ellsworth@hlc.com

*Counsel for Plaintiff-Appellant*

18

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 40(d)(3)(A) and Eighth Circuit Rule 35A because it contains 3,900 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Times New Roman 14-point font.

3.      The electronic version of this brief has been scanned for viruses and has been found to be virus free.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the Court's CM/ECF system on July 15, 2026. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth
